UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

CRYE PRECISION LLC and LINEWEIGHT LLC

                 Plaintiffs,

       v.

DURO TEXTILES, LLC,

                 Defendant.

--------------------------------------------------------------- X

**Docket No. 15-cv-1681 (DLC)**

## AMENDED COMPLAINT

Plaintiffs Crye Precision LLC ("Crye Precision") and Lineweight LLC ("Lineweight") (together with Crye Precision "Crye"), by their attorneys, Greenberg Traurig, LLP, as and for their Amended Complaint against Defendant Duro Textiles, LLC ("Duro"), allege as follows:

### Nature of the Action

1.      In this action, Crye seeks preliminary and permanent injunctive relief as well as damages resulting from Duro's breach of its continuing obligations under a now-expired license agreement pursuant to which Crye granted Duro a non-exclusive license to print Crye's MultiCam® brand camouflage pattern and technology ("MULTICAM") on fabric ("MULTICAM Fabric"), and its willful and wanton infringement of Duro's trade dress rights in MULTICAM (the "MULTICAM Trade Dress").

2.      From 2008 to April 11, 2014, Duro was licensed by Crye to print and sell MULTICAM Fabric.

3.      Duro's license expired on April 11, 2014.  In accordance with its continuing obligations under the expired license agreement, Duro is prohibited from, among other things, printing MULTICAM or any "products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM" or making

modifications to MULTICAM without Crye's prior written consent.

4.     Notwithstanding the expiration of its license in April 2014, and without Crye's authorization, Duro has begun to print on fabric and sell a camouflage pattern referred to as Scorpion W2 or OCP ("Scorpion W2 Fabric"), which is virtually indistinguishable from MULTICAM.

5.     Duro's printing and selling of Scorpion W2 Fabric is a breach of the express terms of its expired license agreement and an infringement of the MULTICAM Trade Dress, which, unless enjoined, will cause Crye irreparable harm for which it has no adequate remedy at law.

### Parties and Jurisdiction

6.     Plaintiff Crye Precision is a New York limited liability company with its principal place of business in Brooklyn, New York.

7.     Plaintiff Lineweight is a New York limited liability company with its principal place of business in Brooklyn, New York.

8.     Defendant Duro is a Delaware limited liability company with its principal place of business in Falls River, Massachusetts.

9.     This Court has original jurisdiction over Crye's Second Claim for Relief pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 15 U.S.C. § 1121(a), and Crye's Third Claim for Relief under 28 U.S.C. § 1338(b).  This Court has supplemental jurisdiction over Crye's First, Fourth, and Fifth Claims for Relief pursuant to 28 U.S.C. § 1367.

10.     In the license agreement at issue, Duro consented to personal jurisdiction and venue in this Court for any claim arising under the agreement.

2

## The MULTICAM Camouflage Pattern and Technology

11.     More than a decade ago, Crye developed MULTICAM. A copy of a photograph of MULTICAM printed on fabric is attached hereto as **Exhibit A**.

12.     MULTICAM's color palette, shapes, and placement of shapes in an irregular and asymmetric pattern were developed by Crye after extensive research, testing, and analysis, and are Crye's sole property.

13.     Crye licenses printers to print and sell MULTICAM Fabric used to manufacture uniforms and other equipment in fulfillment of orders placed by or on behalf of the United States Department of Defense ("Government Sales").  Crye also licenses its printers to print and sell MULTICAM Fabric for products sold commercially ("Commercial Sales").

14.     From 2005 to 2006, the Army tested MULTICAM against the pixelated blue-gray Universal Camouflage Pattern ("UCP") that the Army had officially adopted in 2004.  The Army's official side-by-side test report confirmed that Crye's MULTICAM rated significantly higher than UCP in all environments, meaning that soldiers wearing UCP were being put at significantly higher risk than if they were wearing MULTICAM.

15.     Meanwhile, in 2006, after seeing the ineffectiveness of UCP on the battlefield in Iraq, United States Army Special Operations units independently tested MULTICAM against multiple patterns and adopted it.  MULTICAM has been proven effective by these units during thousands of combat operations in Iraq, Afghanistan, and other theaters. To this day, MULTICAM remains the Special Operations units' issued camouflage pattern for organizational clothing and individual equipment.

16.     In 2009, after numerous complaints from soldiers about the ineffectiveness of the Army issued UCP putting troops at risk in Afghanistan, Congress ordered the Army to take swift

action to improve the situation.  In response, and instead of just relying upon the favorable field data from the early adoption of Crye's MULTICAM by Special Operations units, the Army developed another program to test new camouflages. The Army tested sixteen patterns, including newly introduced Army-developed patterns in a "Pattern-In-Picture" test against MULTICAM. The test results confirmed that Crye's MULTICAM was the best overall performer.

17.     In early 2010, the Army conducted yet another camouflage test.  This time testing five patterns against MULTICAM in numerous Afghanistan environments. Again, MULTICAM outperformed all others. The Army began a limited fielding of MULTICAM in 2010 to serve as an "interim solution" for Operation Enduring Freedom (OEF), which was the name for the entire military campaign in Afghanistan.

18.     In 2010, MULTICAM was selected as the standard issue camouflage pattern for all United States soldiers deployed to Afghanistan, and was renamed "Operation Enduring Freedom Camouflage Pattern," or "OCP," by the United States Government.

19.     Since 2010, MULTICAM has been an official standard issue camouflage pattern of the United States Army.

**Goodwill Associated With MULTICAM**

20.     Since being adopted by Special Forces in 2006 and then named an official Army camouflage pattern in 2010, MULTICAM has generated enormous goodwill for Crye among the military generally, and soldiers in particular.

21.     MULTICAM has generated sales of hundreds of millions of yards of fabric to the military.

WDC 373098906v3

22.     MULTICAM's popularity with the military has enabled Crye to sell tens of millions of dollars worth of other MULTICAM products and non-MULTICAM products to the military.

23.     MULTICAM's popularity also has created for Crye many opportunities for high-profile brand exposure outside of the military, including in fashion, film, and sports.

24.     Tens of millions of yards of MULTICAM Fabric have been printed for commercial sales, which include MULTICAM apparel and other products worn as fashion items outside the military.

25.     The makers of the immensely popular Call of Duty and battlefield video games have dressed their characters in MULTICAM; characters in blockbuster films, including American Sniper, G.I. Joe, Transformers, and World War Z, wear MULTICAM; popular recording artists, including Pharell Williams, have worn MULTICAM in music videos; celebrity-famous fashion label Rag & Bone designed a collection of MULTICAM pieces; and professional sports teams have worn the MULTICAM pattern on their jerseys.

### Crye's Licensing Program

26.     In 2008, Duro and Crye entered into an Exclusive Distribution Agreement dated as of August 20, 2008 ("2008 Duro Agreement"), by which Duro was granted a license for a two-year term to print and sell MULTICAM Fabric and was appointed the exclusive distributor of MULTICAM in the United States.

27.     During the term of the 2008 Duro Agreement, Crye and Duro worked closely together to overcome various MULTICAM production challenges, including, for example, ensuring accurate shade/color match of printed fabrics, and preserving crucial "micro-gradients" throughout the print process.  Duro's substantial efforts in efficiently and accurately printing

5

MULTICAM fabric were instrumental in helping Crye to successfully launch MULTICAM, establish its world-wide success, and preserve and promote the integrity of the MULTICAM brand.

28.     In 2010, the United States Army insisted that Crye license additional printers to print MULTICAM Fabric, purportedly to help ensure the Army would have access to an uninterrupted supply of MULTICAM products, including the MULTICAM Fabric needed to manufacture such products.

29.     In response, Crye developed a network of United States-based printers, including Duro, which it appointed as non-exclusive licensees authorized to print and sell MULTICAM fabric in connection with Government Sales.  As a result, Duro lost its exclusive right to print MULTICAM fabric to fulfill Government Sales.

30.     In recognition of Duro's prior support and to incentivize Duro to provide ongoing support in connection with the new licensing program, Crye agreed to (i) maintain Duro's exclusive right to print and sell MULTICAM Fabric for Commercial Sales and (ii) to compensate Duro for the loss of its exclusive right to print and sell MULTICAM Fabric in connection with Government Sales by sharing with Duro a portion of the revenues Crye earned from its other licensees' sales of MULTICAM Fabric.

31.     Crye provided its licensees, including Duro, with artwork, print screens, and visual shade standards and worked closely with the licensees to share its know-how to enable them to print top quality MULTICAM Fabric.

32.     Crye and Duro collaborated and strategized to determine how to effectively implement the MULTICAM non-exclusive licensing program.  As part of their collaboration,

Crye and Duro discussed the importance of maintaining the integrity of the MULTICAM brand and preserving the goodwill generated for MULTICAM up to that point.

33.     Crye and Duro agreed that to protect the MULTICAM brand, the new license agreements should include a provision prohibiting the licensees from printing camouflage fabrics similar to MULTICAM during and after the term of the licenses.

34.     Thus, with Duro's full support, Crye included a provision in the proposed non-exclusive license, Section 3(h), which would prohibit the licensees, during the term of the contract and following its expiration, from making products with a camouflage pattern "confusingly similar to MULTICAM whether through color palette, pattern or otherwise, including the arrangement or placement of any elements incorporated in MULTICAM," or making modifications to MULTICAM.

35.     The new licensees negotiated the following changes to the proposed Section 3(h): "~~confusingly~~ similar to MULTICAM ~~whether~~ through color palette, pattern or ~~otherwise,~~ ~~including~~ the arrangement or placement of any elements incorporated in MULTICAM" or making modifications to MULTICAM.

36.     The final version of Section 3(h) expressly prohibits the printers, "during and after the term or expiration of the Agreement," from making products with a camouflage pattern "similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM" or making "any additions to, new renderings of, modifications, embellishments, derivative works or other changes of or to MULTICAM" without Crye's prior written consent (the "Non-Compete").

37.     The Non-Compete was included in each of the 2010 and 2012 Non-Exclusive License Agreements Crye entered into with printers (the "2010 License Agreements" and "2012

7

License Agreements," respectively).  Pursuant to these Agreements, Crye gave each printer the non-exclusive right for two-year terms to print and sell MULTICAM Fabric in connection with Government Sales. By its own terms and as set forth in Section 9(f) of the Agreements, the Non-Compete survived expiration of each of the Agreements.

38.     Crye's 2010 License Agreement and 2012 License Agreement with Duro contained the Non-Compete and provided for its survival after expiration of the Agreements.

39.     A true and correct copy of the Non-Exclusive License Agreement dated April 11, 2012 between Crye and Duro (the "2012 Duro License Agreement") is attached hereto as **Exhibit B**.  The 2012 Duro License Agreement had a term of two years and expired on April 10, 2014.

40.     During the terms of the 2010 and 2012 Duro License Agreements, Duro retained the exclusive right to print and sell MULTICAM for Commercial Sales.

### Duro's Deteriorating Financial Condition

41.     In 2013, Duro began showing signs of financial instability.

42.     In 2013, Duro failed to pay Crye over $800,000 in royalties due under the 2012 Duro License Agreement.   Though Duro's owner promised to pay the debt, using personal funds if necessary, Duro did not make payment.  Crye partially mitigated its loss by offsetting against the outstanding receivable amounts it owed Duro for MULTICAM Fabric it purchased from Duro.

43.     In 2014, Duro became unable to fill many of its purchase orders from Crye as well as other customers because it had been effectively cut off from its suppliers due to nonpayment.

44.     Throughout 2014, most of Duro's upper managerial, sales, and technical staff either quit or were laid off.   In 2014 Duro had four different Chief Executive Officers.

45.     Members of Crye's staff have received many calls from Duro's customers and suppliers concerning Duro's possible impending bankruptcy and lack of adequate staff and leadership.

46.     As a result of the financial and overall instability Duro exhibited during 2013 and 2014, Crye concluded as a matter of sound business judgment that, after the expiration of the 20102 Duro License Agreement, Duro should no longer have the exclusive right to make Commercial Sales of MULTICAM.   Nonetheless, in 2014, Crye offered Duro the same non-exclusive rights it offered its other licensees.

## The Scorpion W2 Camouflage Pattern

47.     In or about May, 2014, the Army announced its intention to switch the Army's standard issue camouflage pattern from MULTICAM to Scorpion W2, a camouflage pattern virtually indistinguishable from MULTICAM.   A photograph of Scorpion W2 printed on fabric is attached hereto as **Exhibit C**.

48.     The Army "created" Scorpion W2 by making very minor modifications to MULTICAM, while copying MULTICAM's color palette, shapes, placement of shapes, and irregular and asymmetric pattern.   The overall appearance of Scorpion W2 is virtually indistinguishable from MULTICAM.

49.     The MULTICAM and Scorpion W2 patterns are so similar soldiers currently use MULTICAM and Scorpion W2 interchangeably—in some cases mixing and matching the patterns, e.g. a MULTICAM shirt with Scorpion W2 pants.

50.     The Army has misrepresented that it owns or has licensing rights to Scorpion W2

in an effort to convince Duro and Crye's current licensees to print and sell Scorpion W2 without paying Crye the required licensing fee, presumably based upon the belief that the elimination of Crye's very modest licensing fee would reduce the Army's cost for the finished product.

51.      Crye's licensing fees account for a very small part of the finished uniform cost. Because Crye does not sell finished garments to the Army, it does not and cannot set the prices for finished MULTICAM products purchased by the Government.

### The 2014 License Agreements

52.      In or about May 2014, upon expiration of the 2012 License Agreements, Crye entered into new non-exclusive license agreements ("2014 License Agreements") with eight printers.  Pursuant to these agreements, Crye gave the printers non-exclusive rights to print and sell MULTICAM fabric in connection with both Government Sales and Commercial Sales.

53.      Section 1.4 of the 2014 License Agreements expressly prohibits the licensees from manufacturing or selling variations or modifications of MULTICAM Fabrics without Crye's authorization.

54.      Crye's current licensees, other than Bennettsville (with which Crye is in litigation over Bennettsville's unauthorized printing and selling of Scorpion W2 Fabric), have acknowledged they cannot print and sell Scorpion W2 without Crye's authorization.

55.      Crye's current licensees are authorized to print and sell Scorpion W2 under their current 2014 License Agreements and the licensees (except Bennettsville) have agreed to pay Crye a licensing fee for their sales of Scorpion W2 Fabric.

### Duro's Rejection of the 2014 License Agreement

56.      After reaping immense benefits from its prior license agreements, first as an exclusive licensee, then at the Army's insistence as a non-exclusive licensee, Duro rejected the

new license agreement that was tendered to and accepted by the other licensees.

57.     Duro refused to enter into the 2014 License Agreement unless Crye removed the prohibition against manufacturing or selling modifications or variations of MULTICAM from the Agreement.

58.     After efforts to negotiate a new license agreement with Duro failed, by letter dated June 5, 2014 ("June 5 Letter"), a true and correct copy of which is attached hereto as **Exhibit D**, Crye formally notified Duro that the 2012 Duro License Agreement had expired as of April 10, 2014.

59.     In the June 5 Letter, Crye also reminded Duro of its surviving obligations under the 2012 Duro License Agreement, including the Non-Compete, which, among other things, as part of the initial consideration for the opportunity Duro received, prohibits Duro from "making any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM" following expiration of the 2012 Duro License Agreement.

60.     Duro did not comply with the demands in the June 5 Letter or its obligations following expiration of the 2012 Duro License Agreement.

61.     Crye's outside counsel sent Duro a cease and desist letter dated September 29, 2014, a true and correct copy of which is attached hereto as **Exhibit E**.

62.     Duro did not respond to the cease and desist letter and did not comply with the demands therein.

**First Claim for Relief**
**(Breach of Contract / Money Damages)**

63.     Crye repeats and realleges each of the allegations contained in paragraphs 1 through 62 of this Amended Complaint as if fully set forth herein.

11

64.     The 2012 Duro License Agreement is a valid and binding agreement between Crye and Duro.

65.     Crye has fully performed all its obligations pursuant to the 2012 Duro License Agreement.

66.     In or about October 2014, Duro began accepting and filling orders for Scorpion W2 Fabric from various apparel makers which had contracts to supply apparel to the Government.

67.     The Scorpion W2 camouflage pattern is a product "similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM."   The overall appearance of Scorpion W2 is virtually indistinguishable from MULTICAM.

68.     Thus, despite due demand that Duro comply with Section 3(h) of the 2012 Duro License Agreement (the Non-Compete), Duro has breached and continues to breach the Agreement by printing and selling Scorpion W2 Fabric.

69.     By reason of the foregoing, Crye has been damaged in an amount to be proven at trial.

70.     Crye is also entitled to injunctive relief.

71.     Crye will suffer irreparable harm unless Duro is enjoined from printing and selling Scorpion W2 Fabric as a result of a loss of goodwill associated with MULTICAM and the threat to the viability of its licensing program.

72.     Crye does not have an adequate remedy at law.

73.     Duro's ongoing printing and sale of Scorpion W2 without Crye's authorization will cause Crye an immeasurable loss of goodwill associated with MULTICAM.

74.     Duro's willingness and ability to continue to breach its non-compete threatens to disrupt the established supply chain Crye created for the Army at the Army's request to ensure the Army an uninterrupted supply of performance tested camouflage, i.e., MULTICAM, and now Scorpion W2.

75.     As discussed above, in 2010, at the Army's request, Crye entered into license agreements with the major camouflage printers to authorize them to print and sell MULTICAM Fabric.  Most of those printers remain Crye licensees under current license agreements entered into in 2014.

76.     Crye's licensees have been a stable supply network for companies purchasing MULTICAM Fabric, including fabric, to make finished camouflage products for the Army.

77.     Crye's current licensees are prepared to print and sell Scorpion W2 fabric, but only with Crye's authorization and the payment of licensing fees to Crye.

78.     By refusing to pay a license fee, Duro has secured an unfair commercial advantage over Crye's current licensees because it is able to undercut their cost to print and sell Scorpion W2 fabric.

79.     The license fee, even though only a few cents per yard of Scorpion W2 fabric, puts Crye's current licensees at a competitive disadvantage as compared to Duro.

80.     This difference of a few cents per yard is drastic because contracts to print MULTICAM or Scorpion W2 fabric for Government Sales are often won or lost over pennies per yard.  The competition for these contracts is especially fierce now because the printers all have excess printing capacity.

WDC 373098906v3

81.     Crye's current licensees, all of which (other than Bennettsville) are honoring the terms of the 2014 License Agreements, are losing sales to Duro because of Duro's unfair sales in breach of the Non-Compete in the 2012 Duro License Agreement.

82.     Unless Duro is enjoined from selling Scorpion W2 fabric without paying Crye a license fee, Crye's licensees likely will be forced to stop paying a license fee or stop printing Scorpion W2 fabric, in either case destroying Crye's licensing program.

83.     The balance of hardships warrants the entry of injunctive relief.

84.     As set forth above, If Duro is not enjoined from its unauthorized printing and sale of Scorpion W2, Crye's entire camouflage business and the goodwill associated with MULTICAM will be jeopardized as will its licensing program.

85.     On the other hand, Duro itself could continue to supply Scorpion W2 fabric to the Government by executing the same license agreement Crye has with its current licensees (the agreement Crye tendered to Duro in April 2014).  Crye has agreed that it will return to Duro any licensing fees paid by it under a new agreement if the Court were ultimately to rule in Duro's favor on Crye's First Claim For Relief.

86.     The public interest will not be disserved by the entry of a permanent injunction.

87.     If Duro is enjoined from continuing to breach the Non-Compete, the Army will be able to obtain an uninterrupted supply of camouflage fabrics to fulfill the Army's requirements because each of Crye's licensees is authorized by Crye to print and sell MULTICAM or Scorpion W2 under their respective license agreements.

88.     Crye's current licensees have enormous excess capacity—far more than enough to meet all the Government's requirements for Scorpion W2.

**Second Claim for Relief**

14

WDC 373098906v3

**Trade Dress Infringement, Unfair Competition, and False Designation of Origin**
**(15 U.S.C. § 1125(a))**

89.     Crye repeats and realleges each and every allegation contained in paragraphs 1 through 88 of this Amended Complaint as if fully set forth herein.

90.     The MULTICAM pattern and MULTICAM Trade Dress possess a combination of numerous design elements in a unique format to create a highly distinctive overall impression. The MULTICAM Trade Dress includes, but is not limited to, the six-color pattern of dark brown, brown, green, olive green, tan, and off-white appearing in an irregular and asymmetric pattern covering the surface of the goods as shown in Exhibit A.  Lineweight, LLC is the owner of, and Crye Precision LLC is the exclusive licensee of, the MULTICAM Trade Dress.

91.     Crye, including via its authorized licensees, have continuously and exclusively used the MULTICAM Trade Dress in connection with its products since at least as early as 2006. Since that time, Crye and its licensees have expended considerable sums on advertising, marketing, and promotional activities surrounding the MULTICAM Trade Dress.  Products bearing the MULTICAM Trade Dress have generated billions of dollars in revenue across the industry.  The popularity of the MULTICAM Trade Dress is evident from various news articles and product reviews lauding the distinctive pattern.

92.     As a result of Crye's widespread promotion of the MULTICAM Trade Dress and its continuous and exclusive use for nearly a decade, the MULTICAM Trade Dress enjoys wide public acceptance and association with Crye, and has come to be recognized widely and favorably by the relevant consuming public as an indicator of the origin of Crye's goods.  Crye's MULTICAM Trade Dress has thus acquired secondary meaning.

93.     The MULTICAM Trade Dress is non-functional.  A number of other alternative camouflage designs are available, even for military camouflage.  For example, Crye has designed

15

and licensed other camouflage patterns for military forces around the world, including the Australian Multicam Pattern and the Multi-Terrain Pattern (for the United Kingdom). These other patterns, like MULTICAM, function as camouflage but have a distinctly different look, demonstrating that the MULTICAM Trade Dress is not essential to the purpose of even military camouflage garments in MULTICAM Fabric, and certainly not other camouflage fabrics, garments, or articles. Moreover, the use of the MULTICAM Trade Dress does not reduce the cost of such fabrics as compared to fabrics printed in other camouflage patterns.

94. Scorpion W2 has misappropriated the MULTICAM Trade Dress by mimicking a combination of several elements of that trade dress. Duro's manufacture, distribution, and sale of Scorpion W2 products is likely to cause confusion, to cause mistake, or to deceive as to the origin, sponsorship, or approval by Crye of Duro's goods, services, or commercial activities, thereby enabling Duro to benefit unfairly from Crye's reputation and success.

95. Duro's actions constitute trade dress infringement, unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

96. Duro's infringement has been and continues to be intentional, willful, and without regard to Crye's rights in the MULTICAM Trade Dress.

97. Crye has sustained damages as a direct and proximate result of Duro's infringement of the MULTICAM Trade Dress in an amount to be proven at trial.

98. On information and belief, Duro has gained profits by virtue of its infringement of the MULTICAM Trade Dress.

99. Crye has been and will continue to be irreparably harmed by Duro's conduct, and Duro lacks an adequate remedy at law to compensate for this harm.

100.    Indeed, in Section 14(g) of the 2012 Duro License Agreement, Duro expressly agreed that Crye would be entitled to injunctive relief for any breach involving Crye's "proprietary rights," which would include Crye's trade dress rights in MULTICAM and any camouflage pattern that infringes the MULTICAM trade dress:

> [Duro] acknowledges that any breach of its obligations under this Agreement with respect to the proprietary rights or confidential information of CRYE will cause CRYE irreparable injury for which there are inadequate remedies at law, and therefore CRYE will be entitled to equitable relief in addition to all other remedies provided by this Agreement or available at law.

101.    Section 14(g) was included in the 2012 Duro License Agreement and Crye's license agreements with its other licensees in recognition of the fact that, among other things, a former licensee's breach of its agreement not to compete by printing a camouflage pattern similar to MULTICAM would result in irreparable harm.

102.    Crye relies on Section 14(g) of the 2012 Duro License Agreement only for Duro's agreement to injunctive relief for infringement of Crye's trade dress.  Crye expressly disavows any reliance on Section 14(g) for its claim for injunctive relief based upon Duro's breach of the Non-Compete or for any rights Crye may have against Duro for patent infringement.

103.    This is an exceptional case for which Crye seeks an award of its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

17

**Third Claim for Relief**
<u>**Common Law Unfair Competition (Palming Off and Misappropriation)**</u>

104.    Crye repeats and realleges each and every allegation contained in paragraphs 1 through 103 of this Amended Complaint as if fully set forth herein.

105.    Crye has built up valuable goodwill in the MULTICAM Trade Dress.

106.    The color palette, shapes, and placement of shapes in MULTICAM were developed by Crye after extensive research, testing, and analysis.

107.    Scorpion W2 is a modification of MULTICAM that uses the color palette, shapes, and placement of shapes found in MULTICAM.

108.    Duro, with full knowledge of the popularity of the MULTICAM Trade Dress, intends to and does trade on the goodwill associated with the MULTICAM Trade Dress.

109.    Duro's acts mislead and deceive the public as to the source of Duro's products, permit and accomplish palming off of Duro's goods as those of Crye, and falsely suggest a connection or affiliation with Crye.

110.    By its manufacture, distribution, and sale of Scorpion W2 Products without Crye's authorization or consent, Duro is misappropriating Crye's labor, skills, and expenditures related to the development of MULTICAM for its own commercial advantage to unfairly compete against Crye and its licensees.

111.    Duro's has committed the foregoing acts intentionally, maliciously, and in bad faith.

112.    By virtue of the foregoing acts, Duro has committed unfair competition in violation of state common law.

113.     As a direct and proximate result of Duro's conduct, Crye has suffered damages in an amount to be proved at trial.

114.    Crye does not have an adequate remedy at law, and will continue to be damaged by Duro's sale of Scorpion W2 products unless this Court enjoins Duro from such fraudulent business practices.

**Fourth Claim for Relief**
**(Breach of Contract / Inspection of Books and Records)**

115.    Crye repeats and realleges each and every allegation contained in paragraphs 1 through 114 of this Amended Complaint as if fully set forth herein.

116.    The 2012 Duro License Agreement is a valid and binding agreement between Crye and Duro.

117.    Crye has fully performed all its obligations pursuant to the 2012 Duro License Agreement. Section 9(d)(iii) of the 2012 Duro License Agreement provides Crye an absolute right to inspect and copy Duro's books and records pertaining to Duro's performance under the Agreement:

> For a period of three (3) years after the date or termination or expiration, [Duro] shall make available to Crye for inspection and copying all books and records of [Duro] that pertain to [Duro's] performance of and compliance with its obligations, warranties and representations under the Agreement.

118.    By letter dated January 26, 2015 ("January 26 Letter"), a copy of which is attached hereto as **Exhibit F,** Crye demanded that Duro make available its books and records for inspection and copying within ten days of the letter, and asked that Duro advise Crye on or before January 29, 2015, whether it would prefer to provide copies to Crye or have Crye or its designee inspect the books and records at Duro's offices.

119.    Duro failed to make its books and records available for Crye's inspection.

120.    Crye has no adequate remedy at law for Duro's breach of Section 9(d)(iii) of the 2012 Duro License Agreement and Duro should be ordered to provide Crye copies of its books

and records pertaining to Duro's performance under the 2012 Duro License Agreement.

### Fifth Cause of Action
### (Breach of Contract / Nonpayment)

121.    Crye repeats and realleges each and every allegation contained in paragraphs 1 through 120 of this Verified Complaint as if fully set forth herein,

122.    The 2012 Duro License Agreement is a valid and binding agreement between Crye and Duro.

123.    Crye has fully performed all its obligations pursuant to the 2012 Duro License Agreement.

124.    Section 9(d)(ii) of the 2012 Duro License Agreement provides that, upon expiration of Agreement, all outstanding invoices to Duro for amounts due under the License Agreement were accelerated so they became due and payable on the effective date of the termination, i.e., April 10, 2014, even if longer terms had previously been provided.  Ex. A, § 9(d)(ii).

125.    Despite due demand and in breach of its obligations pursuant to Section 9(d)(ii) of the Duro License Agreement, Duro has not made any payments on the outstanding invoices, as a result of which Crye has been damaged in an amount to be determined at trial.

126.    To the extent Duro has made sales of MULTICAM Products after expiration of the 2012 Duro License Agreement to fill open orders pursuant to Section 7(d) of the Duro License Agreement or to fill new orders in violation of the Duro License Agreement, Duro has breached the Duro License Agreement by failing to make any payments to Crye.  As a result, Crye has, *inter alia*, lost profits it would have made on those sales in an amount to be determined at trial.

### Prayer For Relief

20

WHEREFORE, Crye requests that judgment be entered against Duro as follows:

1.      An injunction preliminarily and permanently:

        (i)      requiring Duro to comply with its obligations pursuant to Section 3(h) of the 2012 Duro License Agreement by not printing or selling any products that are similar to MULTICAM, including through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM, including but not limited to Scorpion W2;

        (ii)      enjoining Duro from printing or selling any products that are similar to MULTICAM or the MULTICAM Trade Dress, including through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM, including but not limited to Scorpion W2, without Crye's express written authorization;

        (iii)      requiring Duro to permit Crye to inspect its books and records concerning all of Duro's sales of MULTICAM Products;

2.      Damages equal to the amount of any and all unpaid invoices issued to Duro;

3.      Damages, including lost profits, from Duro's sales of Scorpion W2 Fabric;

4.      Treble damages due to the willfulness of Duro's trade dress infringement and unfair competition, pursuant to 15 U.S.C. § 1117(a);

5.      An accounting of Duro's sales of Scorpion W2 Fabric;

6.      Attorneys' fees and other expenses incurred by Crye in this action pursuant to § 14(c) of the 2012 Duro License Agreement;

7.      A declaration that this is an exceptional case and an award to Crye of its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117;

8.      Pre- and post-judgment interest; and

9.      Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      June 24, 2015

                              GREENBERG TRAURIG, LLP

                              By:    /s/Justin A. MacLean
                                        Robert A. Horowitz
                                        Lauren B. Grassotti
                                        Justin A. MacLean
                              200 Park Avenue
                              New York, NY 10166
                              Tel.: (212) 801-9200

                              *Attorneys for Plaintiffs Crye Precision LLC*
                              *and Lineweight LLC*