UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

CRYE PRECISION, LLC, and           :
LINEWEIGHT LLC,                    :

                Plaintiffs,   :        CIVIL ACTION NO 15-cv-1681 (DLC)

        v.                       :

DURO TEXTILES, LLC,                :

                Defendant.    :

------------------------------------x


# MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT DURO TEXTILES, LLC'S
## MOTION FOR SUMMARY JUDGMENT


Respectfully submitted,

*/s/ Jonathan G. Graves*
Jonathan G. Graves (*Pro hac vice*)

Cooley LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
Tel:  (703) 456-8119
Fax:  (703) 456-8100
jgraves@cooley.com

Erin M. Estevez (*Pro hac vice*)
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Tel:  (202) 842-7800
Fax:  (202) 842-7899
eestevez@cooley.com

Celia Goldwag Barenholtz
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275
cbarenholtz@cooley.com

*Counsel for Defendant Duro Textiles, LLC*

Dated: October 23, 2015

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 3

LEGAL STANDARD.................................................................................................................. 3

ARGUMENT ................................................................................................................................ 4

I.    THE NON-COMPETE IN SECTION 3(H) OF THE EXPIRED 2012 LICENSE
      AGREEMENT IS UNENFORCEABLE UNDER NEW YORK LAW.......................... 9

II.   EVEN IF THE NON-COMPETE WERE ENFORCEABLE, IT CANNOT BAR
      DURO FROM PRINTING AND SELLING SCORPION W2 ...................................... 10

      A.     § 3(h) Is Inapplicable Because Duro Did Not "Make" Scorpion W2................... 10

      B.     Scorpion W2 Is Not "Similar to" MULTICAM ..................................................... 12

III.  CRYE CANNOT PREVAIL ON ITS CLAIM FOR TRADE DRESS
      INFRINGEMENT BECAUSE THERE IS NO LIKELIHOOD OF CONFUSION
      ON THE PART OF DURO'S SOLE CUSTOMER, THE GOVERNMENT ................ 18

IV.   THE LACK OF POTENTIAL CONFUSION IS ALSO DISPOSITIVE OF
      CRYE'S UNFAIR COMPETITION CLAIM, AND CRYE CANNOT
      ESTABLISH BAD FAITH IN ANY CASE................................................................... 24

CONCLUSION........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10 Ellicott Square Court Corp. v. Mountain Valley Indemnity Co.*,
    634 F.3d 112 (2nd Cir. 2010)...................................................................................12

*American Broad. Cos. v. Wolf*,
    52 N.Y.2d 394 (1981) .........................................................................................5

*American Inst. Of Chem. Eng'rs v. Reber-Friel Co.*,
    682 F.2d 382 (2d Cir. 1982).............................................................................5, 6, 7

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................3

*Baker's Aid v. Hussmann Foodservice Co.*,
    730 F. Supp. 1209 (E.D.N.Y. 1990) .............................................................5, 7, 8, 9

*Cadbury Beverages, Inc. v. Cott Corp.*,
    73 F.3d 474 (2d Cir. 1996)..................................................................................25

*Caldarola v. Calabrese*,
    298 F.3d 156 (2d Cir. 2002)..................................................................................3

*Calico Cottage, Inc. v. TNB, Inc.*,
    No. 11-CV-0336, 2014 U.S. Dist. LEXIS 137816 (E.D.N.Y. Sept. 29, 2014) ...................5, 8

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012)........................................................................19, 20, 21

*DAR & Associates, Inc. v. Uniforce Servs., Inc.*,
    37 F. Supp. 2d 192 (E.D.N.Y. 1999) .....................................................................5, 7

*Empire Props. Corp. v. Mfrs. Trust Co.*,
    288 N.Y. 242 (1942) .....................................................................................10, 11

*Energy Transport, Ltd. v. M.V. San Sebastian*,
    348 F. Supp. 2d 186 (S.D.N.Y. 2004)....................................................................10

*Estee Lauder Inc. v. Gap, Inc.*,
    108 F.3d 1503 (2d Cir. 1997)...............................................................................23

*Fabrication Enters., Inc. v. Hygenic Corp.*,
    64 F.3d 53 (2d Cir. 1995)....................................................................................21

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
    639 F.3d 557 (2d Cir. 2011)..........................................................................12, 13, 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
  111 F.3d 993 (2d Cir. 1997)..............................................................................19, 23

*Genesee Brewing Co. v. Stroh Brewing Co.*,
  124 F.3d 137 (2d Cir. 1997)..............................................................................19

*Holtz v. Rockefeller & Co.*,
  258 F.3d 62 (2d Cir. 2001)..............................................................................3

*Hormel Foods Corp. v. Jim Henson Productions, Inc.*,
  73 F.3d 497 (2d Cir. 1996)..............................................................................20

*Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*,
  64 F. Supp. 3d 494, 514 (S.D.N.Y. 2014)..............................................................................26

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
  456 U.S. 844 (1982)..............................................................................20

*Jordan v. Can You Imagine, Inc.*,
  485 F. Supp. 2d 493 (S.D.N.Y. 2007)..............................................................................10

*Karpinski v. Ingrasci*,
  28 N.Y.2d 45 (1971)..............................................................................9

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
  113 F.3d 373 (2d Cir. 1997)..............................................................................25

*Le Sportsac, Inc. v. Dockside Research, Inc.*,
  478 F. Supp. 602 (S.D.N.Y. 1979)..............................................................................23

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  454 F.3d 108 (2d Cir. 2006)..............................................................................20

*Marisa Christina, Inc. v. Freis*,
  646 F. Supp. 252 (S.D.N.Y. 1986)..............................................................................5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..............................................................................4

*Metrokane, Inc. v. The Wine Enthusiast*,
  160 F. Supp. 2d 633 (S.D.N.Y. 2001)..............................................................................23, 24, 25

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990)..............................................................................10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*National Starch Prods., Inc. v. Polymer Indus., Inc.*,
  79 N.Y.S.2d 357 (1948) ..................................................................................9

*Nycal Corp. v. Inoco PLC*,
  988 F. Supp. 296 (S.D.N.Y. 1997) ...............................................................10

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) .....................................................................22, 25

*Qualitex Co. v. Jacobson Prods. Co.*,
  514 U.S. 159 (1995) ......................................................................................21

*SLY Magazine, LLC v. Weider Publ'ns L.L.C.*,
  529 F. Supp. 2d 425 (S.D.N.Y. 2007), *aff'd*, 346 F. App'x 721 (2d Cir. 2009) ....................26

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009) ...........................................................................25

*Streetwise Maps, Inc. v. VanDam, Inc.*,
  159 F.3d 739 (2d Cir. 1998) .........................................................................20

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) ......................................................................................19

*Universal City Studios, Inc. v. Nintendo Co.*,
  746 F.2d 112 (2d Cir. 1984) .........................................................................24

*Versa Products Co, Inc. v. Bifold Co. (Mfg.) Ltd.*,
  50 F.3d 189 (3d Cir. 1995) ...........................................................................23

*Victorinox AG v. B & F Sys., Inc.*,
  No. 13-CV-4534, 2015 U.S. Dist. LEXIS 83432 (S.D.N.Y. June 21, 2015) ........................24

*Virgin Enters. Ltd. v. Nawab*,
  335 F.3d 141 (2d Cir. 2003) .........................................................................25

*Ward v. Barnes & Noble, Inc.*,
  No. 13-CV-7851, 2015 U.S. Dist. LEXIS 21347 (S.D.N.Y. Feb. 23, 2015) .........................26

*Westmoreland Coal Co. v. Entech, Inc.*,
  100 N.Y.2d 352 (2003) ............................................................................10, 11

**Statutes**

15 U.S.C. § 1125(a) ..........................................................................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Other Authorities**

Fed. R. Civ. P.
    11........................................................................................................................22
    56(a) ...................................................................................................................3
    56.1......................................................................................................................3

NEW OXFORD AMERICAN DICTIONARY 1023 (2d ed. 2005) .........................................................12

**<u>INTRODUCTION</u>**

Last year, the United States Military announced that it was going to stop using Crye's patented MULTICAM design as its camouflage pattern of choice for military uniforms and switch to a pattern it created called Scorpion W2.  Predictably, Crye's MULTICAM licensees began printing Scorpion W2 for the government instead.  Desperate to maintain its lucrative flow of royalty payments, Crye has resorted to any means necessary to force those licensees to pay Crye royalties for Scorpion W2 sales to the government.  Many succumbed to Crye's anti-competitive demands and agreed to pay.  Two printers refused, including Duro.  Crye sued both in an attempt to get a court to order Duro and the other printer to do what Crye could not pressure them to do contractually.

Crye has three causes of action that remain pending against Duro in this Court.  Crye's first cause of action for breach of contract is premised on its 2012 MULTICAM license agreement with Duro, which expired over a year and a half ago.  Crye claims that the "Intellectual Property" provision of that contract prevents Duro from printing Scorpion W2 for the government without paying Crye royalties because Scorpion W2 is "similar to" MUTLICAM.  Second, Crye alleges trade dress infringement, claiming that because the Scorpion W2 pattern "mimics" certain elements of MULTICAM, Duro's printing and sale of Scorpion W2 is likely to cause confusion as to the origin or approval by Crye of Duro's goods.  Finally, Crye asserts a related claim for common law unfair competition, arguing that Duro's Scorpion W2 sales deceive the public as to the source of Duro's goods since the new pattern is allegedly just a modification of MULTICAM.

Each of these three causes of action suffers from fatal defects.  As an initial matter, the non-compete in the parties' expired license agreement purports to prevent Duro from "mak[ing] any products that are similar to MULTICAM" anytime, anywhere "during or after the term or

expiration of this Agreement." The sheer breadth of this provision renders it entirely unenforceable under New York law. Not only does Crye have no legitimate business interest in preventing Duro from printing Scorpion W2, a pattern that the government created and owns, the non-compete lacks any semblance of reasonable geographic or temporal bounds. It is an overbroad restraint of trade designed solely to insulate Crye from legitimate competition. Moreover, Crye has not even alleged (nor can it) any connection between whatever proprietary information it may have shared with Duro as a MULTICAM licensee and Duro's printing of Scorpion W2. The Court should declare this non-compete unenforceable as a matter of law.

Even if the non-compete clause were enforceable, when the Intellectual Property provision of the parties' license agreement is read as a whole, the only reasonable interpretation of the term "make" in the non-compete is "create" – *i.e.*, Duro was prohibited from creating a competing pattern by taking MULTICAM's colors, pattern or shapes, along with reverse engineering MULTICAM and other related restrictions. Crye's contrary interpretation, treating "make" as synonymous with "print" to prevent Duro from merely printing a pattern someone else provides, is divorced from the text and contractual context. Finally, even if Crye were to prevail as to the enforceability of the provision and convince this Court that "make" means "print," its first cause of action would still fail. Scorpion W2 is not "similar to" MULTICAM, as detailed in a sworn declaration by Dr. Timothy O'Neill, a renowned camouflage expert. Instead, Scorpion W2 is a clear derivative of an original design called Scorpion, in which the government has fully paid-up license rights.

Crye cannot prevail on its other two causes of action either. Both trade dress infringement and common law unfair competition require Crye to establish a likelihood of customer confusion because of the similarities between MULTICAM and Scorpion W2. In this

- 2 -

case, such a showing is impossible. The only "consumer" of Scorpion W2 is the government. The government created Scorpion W2, owns two utility patents on the pattern, and is receiving Scorpion W2 fabric from prime contractors ordering that pattern by name from printers.  The government is also aware that Duro is not paying Crye royalties on Duro's Scorpion W2 fabrics.

The undisputed material facts establish that Duro is entitled to judgment as a matter of law on all three counts.  Therefore, the Court should grant Duro's motion for summary judgment.

## STATEMENT OF FACTS

Duro's Rule 56.1 Statement of Material Facts in support of its Motion for Summary Judgment sets forth the material facts as to which there is no genuine issue to be tried.  Those facts are hereby incorporated by reference as though fully set forth herein.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of establishing the absence of any genuinely disputed material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (internal citation omitted).  For its part, "[t]he party against whom summary judgment is sought … 'must do more than simply show that there is some metaphysical doubt as to the material facts. … [T]he nonmoving party must come forward with specific facts showing that there is *a genuine issue for trial*.'"  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

## ARGUMENT

Count I of Crye's Amended Complaint requests injunctive and monetary relief based on Duro's alleged breach of a "non-compete" provision in § 3(h) of the parties' now-expired license agreement.  The Court previously rejected any claim by Crye for injunctive relief under that cause of action.  The Court should grant Duro summary judgment on what remains of Count I, because the non-compete is wholly unenforceable under New York law.  Moreover, the plain language of the provision makes clear that Crye may not use it to prevent Duro from printing and selling Scorpion W2.  Counts II and III of Crye's Amended Complaint likewise fail because both trade dress infringement and unfair competition require a likelihood of customer confusion, which is impossible here because the only customer of Scorpion W2 is the government, which owns the pattern and has its prime contractors specifically ordering it from printers by name.  Duro is entitled to judgment as a matter of law on all three counts.

## I.   THE NON-COMPETE IN SECTION 3(H) OF THE EXPIRED 2012 LICENSE AGREEMENT IS UNENFORCEABLE UNDER NEW YORK LAW

Crye's breach of contract claim is premised entirely on a half-sentence in the middle of § 3(h) providing that Duro will not "make any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM" "during or after the term or expiration of this Agreement."  Duro's Statement of Material Facts ("SMF") ¶ 14.  This remarkably broad and vague non-compete provision is unenforceable under New York law,[1] particularly post-expiration of the contract.

Restrictive covenants in ordinary commercial contracts, such as license agreements, are analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract."  *DAR & Associates, Inc. v. Uniforce Servs., Inc.*, 37

---

[1]     Section 14(d) of the 2012 License Agreement provides that "[i]t shall be governed by and construed in accordance with the laws of the State of New York."  SMF ¶ 15.

F. Supp. 2d 192, 197 (E.D.N.Y. 1999) (citing *Baker's Aid v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1214 (E.D.N.Y. 1990)).  But, "[b]ecause covenants not to compete restrain trade, New York courts rigorously examine such covenants before enforcing them."  *Baker's Aid*, 730 F. Supp. at 1213 (citing *American Inst. Of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982)); *see also Marisa Christina, Inc. v. Freis*, 646 F. Supp. 252, 255 (S.D.N.Y. 1986) (covenants not to compete "are not readily enforced" (citation omitted)).

In analyzing the enforceability of § 3(h) of the 2012 License Agreement, the Court should look to (1) whether Crye has demonstrated a legitimate business interest warranting enforcement, (2) the reasonableness of the provision with reference to its geographic scope and temporal duration, and (3) the degree of hardship that would befall Duro as a result of enforcement.  *DAR*, 37 F. Supp. 2d at 197.  However, "[o]nly after determining that a restrictive covenant would serve to protect against such unfair and illegal conduct and not merely to insulate the [proponent] from competition, does the reasonableness of the covenant in terms of its time, space or scope, or the oppressiveness of its operation become an issue."  *American Inst. Of Chem. Eng'rs*, 682 F.2d at 387 (quoting *American Broad. Cos. v. Wolf*, 52 N.Y.2d 394, 403-04 (1981)) (original alterations and internal quotations omitted); *Calico Cottage, Inc. v. TNB, Inc.*, No. 11-CV-0336, 2014 U.S. Dist. LEXIS 137816, at *13 (E.D.N.Y. Sept. 29, 2014) (citing *American Inst. Of Chem. Eng'rs* standard in the context of analyzing a restrictive covenant in an ordinary commercial contract).  Crye fails miserably with respect to all three prongs.

Crye, which owns a design patent directed to MULTICAM (SMF ¶¶ 3, 7), certainly has a legitimate business interest in protecting its intellectual property rights in that pattern.  When read as a whole, § 3(h) is directed towards protecting those MULTICAM intellectual property rights.  Indeed, the section is entitled "Intellectual Property", and it makes clear that Duro is

prevented from reverse engineering MULTICAM or any other intellectual property right of

Crye, or making derivative works without Crye's consent:

> Intellectual Property.  [Duro] acknowledges and agrees that it will
> not disassemble, decompile, or reverse engineer MULTICAM or
> any other intellectual property right of CRYE, including patent,
> trademark and copyrights, licensed from CRYE or, during or after
> the term or expiration of this Agreement, make any products that
> are similar to MULTICAM through color palette, pattern or
> arrangement or placement of any elements incorporated in
> MULTICAM.  Furthermore, [Duro] agrees that it shall not make
> any additions to, new renderings of, or modifications,
> embellishments, derivative works or other changes of or to
> MULTICAM or any other intellectual property rights of CRYE
> without CRYE's prior written consent and [Duro] agrees that all
> such additions, renderings, modifications, embellishments,
> derivative works or otherwise shall be and remain the sole property
> of CRYE.

SMF ¶ 14.  Duro had unique access to Crye's MULTICAM-related intellectual property as a

result of the licensing arrangement between the companies, and rightfully should not have been

able to misappropriate that intellectual property.

But Crye's legitimate business interest in protecting its MULTICAM intellectual property

ends where a camouflage pattern other than MULTICAM begins.  Crye cannot possibly have a

legitimate business interest in preventing Duro from printing camouflage patterns that are not

based on Crye's proprietary rights, but that Crye deems to be "*similar* to" Crye's MULTICAM

design, with no bounds on the exercise of that judgment or objective standard by which

"similarity" is measured.   Taken to its logical extreme, Duro could never print another

camouflage pattern with browns or greens, or with even a single element placed "similarly" to an

element of the MULTICAM design.

Crye's lack of a legitimate business interest warranting enforcement of the "non-

compete" is further evidenced by the manner in which Crye is attempting to enforce it in this

case.  Here, Crye seeks to prevent Duro from printing Scorpion W2, a pattern that Crye did not

create and does not own or control.  In fact, Crye readily admits that the *government* created the pattern.  SMF ¶ 18.  The U.S. Army created Scorpion W2 from the original Scorpion pattern, in which the government has fully paid-up license rights.  SMF ¶¶ 17, 4-5.  In addition, the U.S. Patent and Trademark Office ("PTO") recently granted to the Government two utility patents covering Scorpion W2.  SMF ¶ 19.  Both patents provide that Scorpion W2 "may be manufactured and used by or for the U.S. Government for governmental purposes without the payment of any royalties thereon or therefore."  SMF ¶ 21.  Crye claims entitlement to royalties on sales of Scorpion W2 to the government from its prior and current MULTICAM licensees, in direct contravention of the government's patent rights.

Importantly, this case is not about enforcing Crye's legitimate business interest in protecting its MULTICAM intellectual property.  A licensor can certainly protect its own product designs, client base and business know-how using a restrictive covenant.  *See Bakers Aid*, 730 F. Supp. at 1215; *DAR*, 37 F. Supp. 2d at 199.  Conversely, a licensor has no legitimate business interest in using a covenant to restrain the use of non-proprietary information, much less proprietary information belonging to a third party, as Crye seeks to do here.  *See Am. Inst. Of Chem. Eng'rs*, 682 F.2d at 387 (no legitimate business interest in protecting a list of customers readily ascertainable from public sources); *compare Bakers Aid*, 730 F. Supp. at 1215 (legitimate business interest existed where licensee lacked an independent source of the relevant technology).

Crye is missing a critical prerequisite to enforcement of its "non-compete":  the causal connection between any proprietary information it shared with Duro and the competition about which it complains.  Such causation is what would transform pure competition into "unfair" competition.  Here, the "non-compete" in § 3(h) does not "serve to protect against *unfair* and

*illegal* conduct," as Crye has not alleged that Duro has done anything to take advantage of its prior access to MULTICAM as a Crye licensee.  Instead, Crye seeks royalties and an injunction solely because Duro is printing a camouflage pattern created, owned, and ordered by the United States government that Crye deems to be "similar to" MULTICAM.  The following discussion from a sister court in this Circuit is instructive:

> There would be unfairness here if, in contravention of the non-compete provision, Defendant wrongfully exploited th[e] information [it received from Plaintiff] in competing against Plaintiff ….  Throughout its voluminous submissions, Plaintiff does not make any clear assertions of how the information it provided Defendant would allow Defendant to unfairly compete with Plaintiff.  Instead, Plaintiff's argument can be summarized as follows:  the parties agreed to a non-compete …, Plaintiff shared what it considers to be confidential information, and Defendant did in fact compete within [the non-compete term]; therefore, Defendant is liable.  Plaintiff skips the critical step of connecting the disclosed information with the subsequent, alleged unfair competition. … There must be some allegation that plausibly characterizes the competition as unfair and not just unwelcomed, otherwise the Court's obligation to balance the competing public policies in favor of robust competition and freedom to contract has no meaning.

*Calico Cottage*, 2014 U.S. Dist. LEXIS 137816, at *18-19.  The causal link missing in *Calico Cottage* is likewise absent here.  Section 3(h) is exactly the type of covenant designed "merely to insulate" the beneficiary of the covenant from competition that New York courts refuse to enforce.

As Crye lacks a legitimate business interest warranting enforcement, the Court's analysis of § 3(h) need go no further.  Regardless, the second prong of the Court's analysis is easily dispensed with.  Indeed the "non-compete" provision is not merely *unreasonable* in terms of its geographic scope and temporal duration; it *has no* limits whatsoever on its geographic scope or temporal duration.  According to the plain language of the term, Duro is not allowed to make any camouflage pattern "similar to MULTICAM," anywhere in the world, until the end of time.

This Court typically requires that restrictive covenants be limited at least as to time or location, if unlimited as to the other.  *See Karpinski v. Ingrasci*, 28 N.Y.2d 45, 50 (1971). Completely unlimited covenants are valid only if drawn to protect actual trade secrets learned in confidence from disclosure.  *See National Starch Prods., Inc. v. Polymer Indus., Inc.*, 79 N.Y.S.2d 357, 363 (1948).  The overarching requirement for enforcement is that the covenant be "a narrowly tailored restraint necessary to protect a legitimate business interest of plaintiff." *Baker's Aid*, 730 F. Supp. at 1216.  Here, the 2012 License Agreement expired in April 2014, over 18 months ago.  With no geographic or temporal limits, § 3(h) is "larger than is necessary to protect" any supposed legitimate business interest Crye has, and therefore cannot be enforced. *Id*. at 1214.  Because the "non-compete" is completely unbounded in geographic scope and temporal duration, it should be struck down for this additional reason.

Finally, the hardship that enforcement of the "non-compete" in § 3(h) would inflict on Duro is clear.  Crye would have the covenant prevent Duro from printing camouflage fabrics for the U.S. Military forever.  This industry is a major part of Duro's business, and the restraint would significantly threaten the viability of Duro, a 65-year-old company, and its manufacturing jobs.  Declaration of John Machado (hereinafter "Machado Decl."), ¶ 7.

Because the "non-compete" found in § 3(h) of the 2012 License Agreement is unenforceable under New York law, Duro is entitled to summary judgment on Count I of Crye's Amended Complaint.

## II.   EVEN IF THE NON-COMPETE WERE ENFORCEABLE, IT CANNOT BAR DURO FROM PRINTING AND SELLING SCORPION W2

Putting aside the defects in the non-compete provision in § 3(h) identified above that are fatal to its enforcement under any circumstances, Crye cannot apply it to prevent Duro's Scorpion W2 sales.  Duro did not "make" Scorpion W2, and Scorpion W2 is not "similar to"

MULTICAM in any case.  Therefore, the present situation falls outside the reach of the 2012 License Agreement.

### A.  § 3(h) Is Inapplicable Because Duro Did Not "Make" Scorpion W2

This Court may interpret a contract that has a plain meaning, unambiguous on its face, as a matter of law.  *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Under New York law … if a contract is unambiguous on its face, its proper construction is a question of law.").  Summary judgment is appropriate in a contract interpretation dispute "when the language [of the contract] is unambiguous." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299-300 (S.D.N.Y. 1997).  A contract term is unambiguous when it has only one reasonable interpretation.  *Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 503 (S.D.N.Y. 2007). Contracts must be read in a "reasonable and logical manner," and provisions should be read in context, giving effect to their general purpose.  *Energy Transport, Ltd. v. M.V. San Sebastian*, 348 F. Supp. 2d 186, 203 (S.D.N.Y. 2004); *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (citing *Empire Props. Corp. v. Mfrs. Trust Co.*, 288 N.Y. 242, 248 (1942)). Undue force should not be given to single words or phrases.  *Westmoreland Coal Co.*, 100 N.Y.2d at 358 (quoting *Empire Props.*, 288 N.Y. at 248).

Crye advances an interpretation of a small portion of § 3(h) – the clause prohibiting Duro from "mak[ing] any products that are similar to MULTICAM" – that is unreasonable, divorced from the context of the provision and contract as a whole, and contrary to the term's plain meaning.  Namely, Crye's Count I necessarily depends on the word "make" in § 3(h) being synonymous with "print."  For example, Crye states that under the 2012 License Agreement, "Duro is prohibited from … <u>printing</u> MULTICAM or any 'products that are similar to MULTICAM ….'"  SMF ¶ 31 (emphasis added).  Crye's legal basis for Count I is entirely dependent on that premise.  Crye's argument is that because Scorpion W2 is "similar to"

MULTICAM, Duro's printing and selling of Scorpion W2 fabrics necessarily breaches § 3(h) of the 2012 License Agreement.  SMF ¶ 32.  But that section can only reasonably be read to prevent Duro from *creating* a competing camouflage pattern.  Since Duro has not done that here, § 3(h) is inapplicable.  For this reason, even if the "non-compete" in § 3(h) is enforceable, Duro is entitled to summary judgment on Count I.

The section from which Crye cherry-picks its "non-compete" provision is entitled "Intellectual Property."  SMF ¶ 14.  The clear intent of this provision, when read as a whole, is to prevent Duro from developing a knock-off of Crye's patented MULTICAM design as a result of Duro's unique access to Crye's MULTICAM intellectual property as a licensee.  Duro may not "disassemble, decompile, or reverse engineer MULTICAM," or add to or modify Crye's pattern.  Stuck in the middle of this provision, the half-sentence clause on which Crye relies – "make any products that are similar to MULTICAM" – has only one reasonable meaning: that Duro may not *create* a new, similar pattern to compete with Crye by misappropriating MULTICAM's color palette, pattern, or arrangement or placement of elements.  Interpreting "make" to mean "create" is consistent with both the language of the entire "Intellectual Property" provision and the ordinary meaning of the word.  *See* THE NEW OXFORD AMERICAN DICTIONARY 1023 (2d ed. 2005) (defining "make" to mean to create); *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) ("It is common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." (quoting *10 Ellicott Square Court Corp. v. Mountain Valley Indemnity Co.*, 634 F.3d 112, 120 (2nd Cir. 2010) (internal citations omitted)).

Duro did not create Scorpion W2, as Crye acknowledges.  *See* SMF ¶ 18.  The government recently developed Scorpion W2, which is effectively a magnification of the original

- 11 -

Scorpion pattern.  SMF ¶ 17.  The government has fully paid-up license rights to use the Scorpion pattern, and owns two utility patents on Scorpion W2.  SMF ¶¶ 4-5, 19.  On that basis, the government claims full ownership of Scorpion W2.  SMF ¶ 22.  The government announced its switch to Scorpion W2 as the Operational Camouflage Pattern for the Army in 2014.  SMF ¶ 23.  Although the government had been using Crye's MULTICAM design as its camouflage pattern of choice prior to that time, it decided not to continue with MULTICAM.  SMF ¶ 24.  The government has been ordering Scorpion W2 from various printers, including Duro, through prime contractors and their subcontractors since 2014.  SMF ¶¶ 25-26.

In other words, Duro is just printing a camouflage pattern that the government handed to Duro.  Duro has not created a pattern to compete with Crye.  In fact, its printing of Scorpion W2 has nothing to do with its status as a former Crye licensee or its access to the MULTICAM intellectual property that § 3(h) was intended to protect.  Read in accordance with the plain meaning of its terms and in context, the "non-compete" in § 3(h) does not apply to this situation.  Crye's contrary reading of the "non-compete," treating "make" as synonymous with "print," is unreasonable as a matter of law.  No reasonable jury could find in Crye's favor on its breach of contract claim premised on that provision.

### B.  Scorpion W2 Is Not "Similar to" MULTICAM

Crye faces one final, insurmountable hurdle on its breach of contract claim:  even if the "non-compete" clause in § 3(h) were legally enforceable and could preclude Duro from merely printing a pattern created by a third party, Scorpion W2 is not "similar to" MULTICAM.

The 2012 License Agreement recites three factors related to whether a pattern is "similar to" MULTICAM:  (1) color palette, (2) pattern, or (3) arrangement or placement of any elements incorporated in MULTICAM.  SMF ¶ 14.  Duro retained a renowned camouflage expert to analyze MULTICAM, Scorpion and Scorpion W2 with reference to these three factors in

particular.  Expert Declaration of Dr. Timothy O'Neill (hereinafter "O'Neill Decl."), ¶ 3.  Dr. Timothy O'Neill is a retired Lieutenant Colonel who spent 25 years in the Army and holds a Bachelor's degree from the Citadel, a Master's degree from the University of North Carolina and a Ph.D. in Experimental Psychology and Neuroscience from the University of Virginia.  *Id.*  He is also a graduate of the Armed Forces Staff College.  *Id.*  Dr. O'Neill taught Engineering Psychology at West Point for 15 years and is known colloquially as the "father of digital camouflage" for his work developing Dual Texture Camouflage in 1975.  *Id.*  He acts as a camouflage consultant to the Army, Navy, Marine Corps, Federal Bureau of Investigation, Bureau of Land Management, Canada, Jordan, Qatar, New Zealand, Afghanistan, Mexico, and several private companies.  *Id.*  Dr. O'Neill's *curriculum vitae* is attached to his Declaration.

According to Dr. O'Neill, a camouflage pattern's color palette is characterized by its predominant color, contrast, and directional gradients (random, horizontal, or vertical).  O'Neill Decl. ¶ 12.  Its pattern or geometry depends on spatial frequency components (low versus high) and directional flow (horizontal versus vertical, shadowing).  *Id.*  The analysis of the arrangement or placement of elements in a camouflage design is effectively the same as the analysis of its pattern.  *Id.*

Crye developed the original Scorpion pattern in the early 2000s under a government contract.  SMF ¶ 4.  Crye's '848 Design Patent is directed to Scorpion.  *Id.*  According to the face of the '848 Patent, the government has a fully paid-up license in the claimed design, as it was developed pursuant to a government contract.  SMF ¶ 5.  Crye developed the MULTICAM pattern after it developed Scorpion, and contends that the MULTICAM design is the "subject of" a separate patent, Crye's '861 Patent.  SMF ¶¶ 6-7.  Recently, the government developed Scorpion W2 from the original Scorpion design.  SMF ¶ 17.  The government has filed four

utility patent applications directed to Scorpion W2, two of which issued this year: U.S. Patent Numbers 9,062,938 (the "'938 Patent") and 9,074,849 (the "'849 Patent")[2].   SMF ¶ 19.   As reflected on the face of each of these patents, the U.S. Patent and Trademark Office granted them over the MULTICAM prior art design patent.  SMF ¶ 20.

An analysis of Scorpion W2 reveals its unmistakable roots in the original Scorpion design.  Both Scorpion and Scorpion W2 have a predominantly green color palate.  O'Neill Decl. ¶ 13.  Their contrasts are similar.  *Id.*  Scorpion W2 has gradients in both directions (horizontal and vertical), as does Scorpion.  *Id.*; *see also* '938 Patent, Col. 21, lines 61-66 ("[t]he aspects of the disclosed embodiments provide a camouflage pattern that … use [ ] gradients in both fill [width] and warp [length] directions …").  Thus, the color palette of Scorpion W2 is very similar to the color palette of Scorpion, although similar colors will be used in any competently-designed camouflage patterns meant for common environments.  O'Neill Decl. ¶ 13.

The pattern and geometry of Scorpion W2 are an enlarged version of Scorpion; Scorpion W2 has larger blobs with essentially identical shapes.  *Id.* ¶ 14.  Thus, the pattern and geometry of the Scorpion W2 pattern are nearly identical to the pattern and geometry of the Scorpion pattern.  *Id.*  The Scorpion W2 pattern includes the arrangement and placement of elements from the Scorpion pattern.  *Id.* ¶ 15.  Because the pattern and geometry of Scorpion W2 are an enlarged version of Scorpion, they are nearly identical.  *Id.*

In contrast, unlike both Scorpion and Scorpion W2, MULTICAM's color palette is predominantly brown.  *Id.* ¶ 19.  Moreover, MULTICAM has a scattered or random directional gradient.  *Id.*; *see also* '938 Patent, Col. 4, line 66 - Col. 5, line 5 ("the distribution of dark and light color regions of the camouflage pattern of the '861 patent is random in direction, size and

---

[2]       The other two applications are related and were filed recently, on May 20 and 26, 2015.  SMF ¶ 19.

location for the dark and light portions of the pattern.  This results in gradient differences in the camouflage pattern of the '861 patent that might be referred to as 'scattered'").

Regarding the pattern and geometry of MULTICAM as compared to Scorpion W2, both have small patches with sharp edges in the foreground, but they differ dramatically.  O'Neill Decl. ¶ 20.  MULTICAM has thin, line-like vertical elements that are completely absent from Scorpion and Scorpion W2.  *Id.*; '938 Patent, Col. 4, lines 29-41 ("[t]he distinctive vertically oriented line elements of the '861 patent, also referred to as vertical twig and branch elements, are elongated and thin") and *id.* at Col. 22, lines 12-15 ("[t]he use of thin vertically oriented line elements in the warp [length] direction of a pattern repeat is eliminated in the camouflage pattern 100 of the disclosed embodiments.").  This impacts their directional flow.  O'Neill Decl. ¶ 20.  MULTICAM's vertically oriented line elements create a vertical flow, whereas the lack of these elements in Scorpion W2 creates a predominantly horizontal flow.  *Id.*

Finally, in considering the arrangement and placement of elements in the Scorpion W2 pattern versus MULTICAM, the arrangement and placement of elements in the Scorpion pattern should be considered.  *Id.* ¶ 21.  As described above, the pattern and geometry of the Scorpion W2 pattern are nearly identical to the pattern and geometry of the Scorpion pattern, with the Scorpion W2 pattern differing only in size.  *Id..*  Because the Scorpion W2 pattern only incorporates the arrangement and placement of elements in the Scorpion pattern, the Scorpion W2 pattern fails to use, arrange, or place any elements of the MULTICAM pattern.  *Id.*

The Scorpion pattern (corresponding to Figure 2 from the '848 Patent) and the Scorpion W2 pattern (corresponding to Figure 11 from the '938 Patent) are reproduced below with yellow circles showing corresponding portions of the patterns[3].  O'Neill Decl. ¶ 16.

---

[3]     Note that the two yellow ovals have slightly different shapes because the Scorpion image is shown from a directly overhead view while the Scorpion W2 image appears to be slanted.  O'Neill Decl. ¶ 16 n.2.



Scorpion



Scorpion W2

As a comparison of these two images shows, the original Scorpion pattern and Scorpion W2 appear to be nearly identical.  O'Neill Decl. ¶¶ 14, 15.

But Scorpion and Scorpion W2 differ significantly from MULTICAM, notwithstanding Crye's unsubstantiated allegation that the two patterns are "virtually indistinguishable."   A.C. ¶¶ 4, 47, 48, 67.  Below, the Scorpion and Scorpion W2 patterns are shown side-by-side, with the MULTICAM pattern (corresponding to a figure from the '861 Patent) below them, including annotations on the latter to show the vertical elements that are so prominent in the MULTICAM design but completely absent from the Scorpion W2 pattern.  O'Neill Decl. ¶ 22.

- 16 -



Scorpion                                          Scorpion W2



MULTICAM ('861 Patent)

The MULTICAM design shares some design elements, but with critical differences that distinguish it from Scorpion and Scorpion W2.  O'Neill Decl. ¶ 24.  In addition to its ubiquitous vertical "twig and branch" elements, MULTICAM has a superficial, small-component pattern of blotches in a distinct horizontal flow overlying a background pattern with feathered shaded edges that do not show a directional bias on inspection of the illustrated examples.  *Id.*  These feathered shaded edges of the background pattern are also unique to MULTICAM, and are not found in the Scorpion and Scorpion W2 designs.  *Id.*

The inescapable conclusion from a comparative analysis of the designs is that Scorpion W2 is not "similar to" MULTICAM, as required to trigger the application of the "non-compete"

in § 3(h) of the 2012 License Agreement.  *Id.* ¶ 25.  On the contrary, Scorpion W2 is clearly a direct derivative of the original Scorpion pattern.  *Id.*  Therefore, Duro is entitled to summary judgment on Crye's Count I, as it is not making a camouflage pattern "similar to" MULTICAM.

### III.   CRYE CANNOT PREVAIL ON ITS CLAIM FOR TRADE DRESS INFRINGEMENT BECAUSE THERE IS NO LIKELIHOOD OF CONFUSION ON THE PART OF DURO'S SOLE CUSTOMER, THE GOVERNMENT

In Count II, Crye alleges Trade Dress Infringement in violation of 15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act).  "To establish a claim of trade dress infringement under § 43(a), plaintiff must first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning."  *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (emphasis in original) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)).  However, distinctive trade dress is only entitled to protection if it is also non-functional.  *Id.* (citations omitted).  "Second, plaintiff must demonstrate that there is a likelihood of confusion between defendant's trade dress and plaintiff's."  *Id.* (citing *Two Pesos, Inc.*, 505 U.S. at 769-70).

Thus, in order for Crye to be able to protect its MULTICAM pattern as "trade dress" in the first place, the pattern must be distinctive.  *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (citing *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997)).  Crye has not claimed that its MULTICAM trade dress is inherently distinctive; rather, Crye relies on a claim that MULTICAM has acquired secondary meaning.  *Id.*; A.C. ¶ 92.  "A mark has acquired 'secondary meaning' when, 'in the minds of the public, the primary significance of a product feature … is to identify the source of the product rather than the product itself.'"  *Christian Louboutin*, 696 F.3d at 216 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)).

Putting aside whether MULTICAM is distinctive and non-functional for the time being, it is clear at this stage that Crye cannot prevail on its Second Claim for Relief: even if the MULTICAM pattern is protectable, the second prong of the Trade Dress Infringement analysis requires Crye to show that Duro's "use of a similar mark is likely to cause consumer confusion." *Id*. at 217 (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006)). The "likelihood of confusion" inquiry focuses on whether "an appreciable number of ordinarily prudent purchasers" of the type of product in dispute "are likely to be misled, or indeed simply confused, as to the source of the goods … or that there may be confusion as to plaintiff's sponsorship or endorsement of the junior mark." *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 502 (2d Cir. 1996) (citations omitted). "To support a finding of infringement, a probability of confusion, not a mere possibility, must exist." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

There is no possible way that Crye can establish that Duro's printing and sale of Scorpion W2 is likely to cause confusion among customers based on its alleged similarity to MULTICAM. The ultimate purchaser of Scorpion W2 is the U.S. Government, which created Scorpion W2, claims ownership, and is distinctly aware that Duro is not paying Crye royalties on Duro's Scorpion W2 fabrics. Duro's direct customers are government prime contractors and subcontractors, which are ordering Scorpion W2 fabrics from Duro by name. These undisputed material facts require summary judgment in Duro's favor on Count II.

One of the primary aims of trademark law is to protect consumers. *Christian Louboutin*, 696 F.3d at 215 (describing trademark law as primarily intended to, *inter alia*, "secure the public's interest in protection against deceit as to the sources of its purchases") (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir. 1995)). Preventing the

copying of a mark that identifies the source of a particular item "reduces the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that *this* item – the item with this mark – is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Id*. at 215-16 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995)).  As contrasted with "patent law or copyright law, which seek to encourage innovation," trademark law "is *not* intended to 'protect[] innovation by giving the innovator a *monopoly*' over a useful product feature …. [T]rademark law [instead] seeks to preserve a 'vigorously competitive market' for the benefit of consumers." *Id*. at 216 (emphasis in original) (internal citations omitted).

Crye claims that Scorpion W2 "mimic[s] a combination of several elements of [the MULTICAM] Trade Dress" and therefore "Duro's manufacture, distribution, and sale of Scorpion W2 products is likely to cause confusion, to cause mistake, or to deceive as to the origin, sponsorship, or approval by Crye of Duro's goods …." A.C. ¶ 94.  But there can be no dispute that in this case, the ultimate purchaser of Duro's Scorpion W2 products – the U.S. Government – is not in need of the protection of the trademark laws.  Crye admits that the government is the entity that created Scorpion W2.  SMF ¶ 18.  The government owns two utility patents directed to the pattern, both of which (1) explicitly say that Scorpion W2 "may be manufactured and used by or for the U.S. government … without the payment of any royalties thereon or therefor," and (2) describe in detail the differences between the Scorpion W2 pattern and the MULTICAM pattern.  SMF ¶ 21.  The government publicly announced its decision to switch from MULTICAM camouflage to Scorpion W2 for military uniforms, and its prime and subcontractors are intentionally placing orders for Scorpion W2 instead of MULITCAM from

- 20 -

printers.  SMF ¶¶ 23, 25-26.  Duro is one of the printers fulfilling those orders, and is not selling Scorpion W2 to anyone else.  SMF ¶¶ 26, 28; Machado Decl. ¶ 4.

Given these undisputed facts, it is unclear how Crye can allege without violating Rule 11 of the Federal Rules of Civil Procedure that the government or its contractors are confused, mistaken, or deceived as to the source or sponsorship of the goods they are purchasing.  The government (in addition to creating the Scorpion W2 design and owning the utility patents) and its contractors (in addition to ordering the pattern by name from printers) are fully aware of which printers succumbed to Crye's anti-competitive demands for royalties on Scorpion W2 sales and which did not:  the royalties that printers are paying to Crye for Scorpion W2 are currently being allowed by the government as a specific line item passed up through the primes and subcontractors.  SMF ¶ 27; Machado Decl. ¶ 6.  Clearly, the government and its contractors know that Duro's Scorpion W2 goods do not originate with, nor are they sponsored or approved by, Crye.  Thus, there is nothing approaching a "probability" of any confusion whatsoever on the part of the Scorpion W2 customers that exist, and Crye cannot establish a likelihood thereof.

This Court typically analyzes likelihood of confusion with reference to eight non-exclusive factors first articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):

> (1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group.

*See Fun-Damental Too*, 111 F.3d 993 at 1002-1003.  Consideration of these guiding factors likewise supports Duro's entitlement to judgment as a matter of law on Count II, as at least factors two and five through eight weigh in Duro's favor, and factor four is irrelevant.

- 21 -

With regard to the second factor, Duro has already established that Scorpion W2 is not "similar to" MULTICAM.  *See* Section II.B. *supra*.  In the context of a claim for trade dress infringement, the similarity standard is even higher than that described in the 2012 License Agreement – customer confusion is highly unlikely unless two products have a *substantially* similar appearance.  *See Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 641 (S.D.N.Y. 2001) ("First and foremost, we find that the [two products at issue] are not substantially similar in appearance."); *see also Versa Products Co, Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 202 (3d Cir. 1995) ("[U]nless the allegedly infringing … dress is substantially similar to the protectable … dress, it is highly unlikely that consumers will confuse the product sources represented by the different … trade dresses.").  A similar product that has features sufficiently different to avoid customer confusion is not subject to a claim of trade dress infringement.  *See, e.g.*, *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979).  The vertical elements of MUTLICAM that are completely absent from the Scorpion W2 design are an amply distinct feature to make it unlikely that knowledgeable, prudent customers—here, only the government—would be confused between the two patterns. *Estee Lauder Inc. v. Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir. 1997).

Furthermore, Crye asserts that "[t]he MULTICAM pattern and MULTICAM Trade Dress possess a combination of numerous design elements in a unique format to create a highly distinctive overall impression," A.C. ¶ 90, which undermines its ability to take the position that MULTICAM is so substantially similar to Scorpion W2 to cause confusion.  *See Metrokane, Inc.*, 160 F. Supp. 2d at 641 ("Ironically, plaintiff's arguments that [its product's] ornamental features 'distinguish[][it] from the products of [plaintiff's] competitors' belie its assertions that the [allegedly infringing product] 'is confusingly similar in appearance ….'" (alterations in

original) (internal citations omitted)).  A comparison of Scorpion W2 and MULTICAM to the Scorpion pattern reveals that Scorpion W2, a Scorpion derivative, resembles Scorpion far more than it resembles MULTICAM.  *See* Section II.B., *supra*; *Metrokane, Inc.*, 160 F. Supp. 2d at 641 ("As defendants persuasively argue, any comparison of the [two products] must also involve their common design predecessor ….  Comparing these three items, it is clear that the [allegedly infringing product] resembles the [original design] as much as it resembles [plaintiff's product]." (citing *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 116 (2d Cir. 1984))).

The fourth factor, the likelihood that the prior owner will bridge the gap between the products, is a non-issue in this case.  *See Victorinox AG v. B & F Sys., Inc.*, No. 13-CV-4534, 2015 U.S. Dist. LEXIS 83432, at *19 (S.D.N.Y. June 21, 2015) (when products are found in the same market, there is no gap to bridge, rendering the fourth factor irrelevant).  Crye has not alleged that it is a printer capable of printing Scorpion W2 for the government itself and is already getting royalties from some of its other former and current MULTICAM licensees on their sales of Scorpion W2 products.  SMF ¶ 39.

The fifth, sixth, seventh, and eighth factors weigh heavily against Crye.  For the reasons described above, there can be no credible evidence of actual confusion on the part of the government, the creator of Scorpion W2, or its prime and subcontractors, placing orders for that pattern by name.  *See* Section III, *supra*.  Crye has admitted that the government, not Duro, created Scorpion W2, SMF ¶ 18, and therefore Crye has not and cannot adduce evidence that Duro intentionally copied the MULTICAM design or intends to mislead or deceive the government.  *See Metrokane, Inc.*, 160 F. Supp. 2d at 641 ("[W]e find no intentional copying of plaintiff's trade dress, and thus no bad faith on defendants' part."); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117–18 (2d Cir. 2009); *Landscape Forms, Inc. v. Columbia*

- 23 -

*Cascade Co.*, 113 F.3d 373, 383 (2d Cir. 1997).  Crye has not alleged that Duro's Scorpion W2 products are of inferior quality.  *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996).  Finally, there can be no serious dispute that the government is a sophisticated purchaser making an informed and intentional decision to procure Scorpion W2.  "The degree of sophistication of consumers can have an important bearing on likelihood of confusion.  Where the purchasers of a product[] are highly trained professionals, they know the market and are less likely than untrained consumers to be misled or confused by the similarity of different marks." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003).

Duro respectfully submits that when a sophisticated purchaser selects one product – in this case, the government which has chosen Scorpion W2 – as an intentional choice over a product it knows is different – in this case, MULTICAM – no reasonable jury could find a likelihood of confusion.  In view of the *Polaroid* factors and for the reasons described herein, there are no material facts in dispute as to the likelihood of confusion on the government's part between MULTICAM and Scorpion W2 or as to Crye's sponsorship or approval of Duro's goods.  Therefore, Duro is entitled to judgment as a matter of law on Count II.

## IV.    THE LACK OF POTENTIAL CONFUSION IS ALSO DISPOSITIVE OF CRYE'S UNFAIR COMPETITION CLAIM, AND CRYE CANNOT ESTABLISH BAD FAITH IN ANY CASE

Under New York law, the heart of an unfair competition claim "is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Int'l Diamond Imps., Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 514 (S.D.N.Y. 2014) (citation omitted).  The likelihood of confusion showing required under New York common law is the same as that required for a federal trade dress infringement claim.  *Ward v. Barnes & Noble, Inc.*, No. 13-CV-7851, 2015 U.S. Dist. LEXIS 21347, at *33 (S.D.N.Y. Feb. 23, 2015) (citing *SLY Magazine, LLC v. Weider*

*Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007), *aff'd*, 346 F. App'x 721 (2d Cir. 2009)).  Duro has already established that Crye cannot meet this requirement, *see* Section IV.

Crye also falls well short with respect to the necessary showing of bad faith.  "The inquiry into bad faith considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between [its] and the senior user's product."  *Int'l Diamond Imps.*, 64 F. Supp. 3d at 514 (alteration in original) (citation omitted).  Once again, the circumstances of this case make it impossible for Crye to succeed.  The government created the Scorpion W2 pattern, and Duro is merely one of the printers fulfilling orders for Scorpion W2 fabrics at the request of the government.  *See* Section II.A., *supra*.  Duro therefore could not have had the intent to "capitalize" on the goodwill Crye alleges is associated with MULTICAM.  For the same reason, there is nothing "unfair" about Duro's printing of Scorpion W2 just because Duro used to be a MULTICAM licensee.

Because the undisputed material facts also make it impossible for Crye to succeed on its claim of common law unfair competition under New York law, Duro is entitled to summary judgment on Count III.

## CONCLUSION

For these reasons, Duro respectfully requests that the Court grant its motion for summary judgment.

Dated:  October 23, 2015                    Respectfully submitted,

                                            */s/ Jonathan G. Graves*
                                            Jonathan G. Graves (*Pro hac vice*)

                                            Cooley LLP
                                            One Freedom Square
                                            Reston Town Center
                                            11951 Freedom Drive
                                            Reston, VA 20190

- 25 -

Tel:  (703) 456-8119
Fax:  (703) 456-8100
jgraves@cooley.com

Erin M. Estevez (*Pro hac vice*)
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Tel:  (202) 842-7800
Fax:  (202) 842-7899
eestevez@cooley.com

Celia Goldwag Barenholtz
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275
cbarenholtz@cooley.com

*Counsel for Defendant Duro Textiles, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October 2015, the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DURO TEXTILES, LLC'S MOTION FOR SUMMARY JUDGMENT**, along with the supporting Statement of Material Facts, Declaration of Erin M. Estevez and exhibits attached to Ms. Estevez's Declaration, Declaration of John Machado and the exhibits attached to Mr. Machado's Declaration, and the Declaration of Timothy O'Neill and the exhibit attached Mr. O'Neill's Declaration, were filed though the ECF system and will be sent electronically, via the ECF system, to the registered participants listed below, as also identified on the Notice of Electronic Filing (NEF). Exhibits 1, 3 and 5 to Mr. Machado's Declaration were filed through the ECF system in redacted form. Upon filing, Counsel for Defendant will contact the individuals listed below by e-mail, offering to provide unredacted versions of Exhibits 1, 3 and 5 to be maintained in accordance with the protective order entered in this matter.

Lauren Beth Grassotti
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-6765
Fax: (212) 801-6400
villagrassottil@gtlaw.com

Robert Allen Horowitz
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-2194
Fax: (212) 224-6114
horowitzr@gtlaw.com

Justin Albano MacLean
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-9200
Fax: (212) 801-6400
macleanj@gtlaw.com

*Attorneys for Plaintiffs*

*/s/ Jonathan G. Graves*
Jonathan G. Graves (*Pro hac vice*)

120373054