UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
CRYE PRECISION LLC and LINEWEIGHT      :        15cv1681 (DLC)
LLC,                                   :
                                       :        OPINION & ORDER
                  Plaintiffs,          :
                                       :
          -v-                          :
                                       :
DURO TEXTILES, LLC,                    :
                                       :
                  Defendant.           :
                                       :
-------------------------------------- X

APPEARANCES

For plaintiffs:

Robert A. Horowitz
Justin A. MacLean
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166

Lauren Beth Grassotti
Meyer, Suozzi, English & Klein, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, NY 11530

For defendant:

Jonathan G. Graves
Cooley LLP
One Freedom Square
Reston Town Center
11951 Freedom Drive
Reston, VA 20190

Erin M. Estevez
Cooley LLP
1299 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004

Celia Goldwag Barenholtz
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036

DENISE COTE, District Judge:

This action arises from a dispute between a licensor of a patented camouflage pattern and a former licensee. The licensee, defendant Duro Textiles, LLC ("Duro"), is a printer that incorporates camouflage patterns onto fabrics. The patent owner and licensor, Crye Precision LLC ("Crye Precision") and Lineweight LLC ("Lineweight") (collectively "Crye"), maintain three claims for breach of contract, trade dress infringement, and common law unfair competition arising from Duro's printing of a camouflage pattern owned by the U.S. Government. Duro moves for summary judgment pursuant to Fed. R. Civ. P. 56 on these three claims. Crye opposes the motion and has submitted a request for further discovery from Duro pursuant to Fed. R. Civ. P. 56(d). For the following reasons, Duro's motion for summary judgment is granted. Crye's request for further discovery pursuant to Rule 56(d) is denied.

**BACKGROUND**

The following facts are undisputed or taken in the light most favorable to Crye. Plaintiff Lineweight is the purported owner and Crye Precision is the purported exclusive licensee of

four patents (collectively, the "Crye Patents").  The Crye Patents are generally directed to camouflage patterns.

One of the Crye Patents, the '848 Patent, is directed towards a camouflage pattern known as Scorpion, which Crye developed for the U.S. Army under a Government contract in the early 2000s.  According to the '848 Patent, the U.S. Government "has a paid-up license in this invention and the right in limited circumstances to require the patent owner to license others on reasonable terms as provided for by the terms of contract No. DAAD16-01-C-0061 awarded by . . . the United States Department of Defense."

Crye developed a camouflage pattern called MULTICAM shortly after it developed Scorpion.  Crye claims that MULTICAM is the subject of the '861 Patent.  Crye licenses printers to print and sell fabric in the MULTICAM pattern, both for products sold commercially and for orders placed by or on behalf of the Government.  Duro was one of those printers.

Crye and Duro entered into an exclusive distribution agreement on August 20, 2008 (the "2008 License Agreement").  The 2008 License Agreement appointed Duro as the exclusive distributor of MULTICAM in the United States, and granted Duro a

two-year license to print and sell MULTICAM fabric to the Government and commercially.

In 2010, the U.S. Government selected MULTICAM as the standard issue camouflage pattern for soldiers deployed in Afghanistan, and renamed it "Operation Enduring Freedom Camouflage Pattern" ("OEF-CP").  Upon expiration of the 2008 License Agreement, Crye renewed Duro's exclusive license to print and sell MULTICAM commercially, but only granted Duro a non-exclusive license to print and sell MULTICAM in connection with Government sales (the "2010 License Agreement").  The 2010 License Agreement was also for a two-year term.

In 2012, after the expiration of the 2010 License Agreement, Crye again granted Duro a non-exclusive license to print and sell MULTICAM in connection with Government sales as well as an exclusive license to print and sell MULTICAM commercially (the "2012 License Agreement").  Section 3(h) of the 2012 License Agreement provides:

> Intellectual Property.  [Duro] acknowledges and agrees that it will not disassemble, decompile, or reverse engineer MULTICAM or any other intellectual property right of CRYE, including patent, trademark and copyrights, licensed from CRYE or, during or after the term or expiration of this Agreement, make any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM. Furthermore, [Duro] agrees that it shall not make any additions to, new renderings of, or modifications, embellishments, derivative works or other changes of or to MULTICAM or any other

4

> intellectual property rights of CRYE without CRYE's
> prior written consent and [Duro] agrees that all
> such additions, renderings, modifications,
> embellishments, derivative works or otherwise shall
> be and remain the sole property of CRYE.[1]

(Emphasis added.)  The 2012 License Agreement otherwise expired on April 10, 2014, and is governed by New York law.

Recently, the United States Army created a new camouflage pattern called Scorpion W2.[2]  The Government filed two utility patent applications related to Scorpion W2, and they were issued on June 23 and July 7, 2015.  The specifications of both patents refer to Scorpion W2, and both were granted over the Crye Patents' prior art.  Both patents described the differences between Scorpion W2 and MULTICAM patterns, and provide that "[t]he invention described herein may be manufactured and used by or for the U.S. Government for governmental purposes without the payment of any royalties thereon or therefor."  The Government claims exclusive ownership of and rights to Scorpion W2.

In 2014, the Government announced a switch from MULTICAM to Scorpion W2 as the Army's standard issue camouflage pattern.  On November 19, 2014, the Army specified in an article on its

---

[1] This provision was also included in the 2010 License Agreement.

[2] The Government refers to Scorpion W2 as Operational Camouflage Pattern ("OCP").  Crye admits that the Government created Scorpion W2.

website that "[s]oldiers deployed to Afghanistan will continue
to be fielded with uniforms and [other equipment] in Operation
Enduring Freedom Camouflage Pattern until inventories are
exhausted," and that Scorpion W2 products would be "gradually
phased in to minimize the cost to Soldiers and the Army."
Scorpion W2 uniforms were scheduled to be introduced during the
fourth quarter of Fiscal Year 2015 at Army Clothing and Sales
Stores for soldiers to purchase.  The parties have not presented
any evidence of whether this Scorpion W2 rollout occurred on
schedule or whether MUTLICAM products are also available in Army
Clothing and Sales Stores.

        Since 2014, the Government has ordered Scorpion W2 through
contractors.  Duro is one of the Government's suppliers of
fabric printed with the Scorpion W2 pattern.  Duro's only sales
of Scorpion W2 have been for the Government, specifically to
Government contractors and subcontractors in the supply chain
for the U.S. Army.

        In a June 11, 2014 letter to Crye, Duro rejected a new
proposed non-exclusive license agreement with Crye ("2014
Proposed License Agreement").  Among other reasons given to
Crye, Duro rejected the agreement because it contained "an
unacceptable limitation on printing similar patterns . . . that
Duro cannot agree to, as any such limitation would have a
significant negative impact on Duro's business given that recent

U.S. Army announcement that it will be utilizing its own pattern . . . on a going-forward basis."  In the letter, Duro stated that it "remains ready, willing, and able to enter into a new, mutually beneficial licensing agreement" and attached a marked-up copy of the Non-Exclusive License Agreement with concerns and changes indicated.

Crye filed a complaint dated November 11, 2014 in this Court in case number 14cv9012 (DLC).  That complaint was directed at Duro's printing and sale of MULTICAM fabric after the expiration of the 2012 Agreement and included claims for breach of contract, trademark infringement, and patent infringement.  The patent infringement claim was directed exclusively to Duro's commercial sales of MULTICAM and explicitly excluded Duro's Government sales.

According to Crye, having received assurances from Duro that it did not print any MULTICAM fabric after expiration of the 2012 Agreement and that any sales of MULTICAM fabric after expiration of that agreement were consistent with its rights upon termination of the agreement, on January 12, 2015, Crye amended its complaint to eliminate claims related to the printing of MULTICAM fabric (except to recover unpaid license fees) and instead focused on Duro's sales of Scorpion W2 in alleged breach of § 3(h) of the 2012 License Agreement.

On January 29, 2015, Duro filed a motion to dismiss Crye's amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  Duro's motion was premised on the ground that, pursuant to 28 U.S.C. § 1498, Crye's claims directed to Duro's manufacture and sale of Scorpion W2 products for the benefit of the Government could be brought only against the Government in the Court of Federal Claims.  Duro also moved to dismiss on the ground that Crye had failed to plead sufficient facts to support its allegations of diversity jurisdiction.  On February 17, Crye filed a notice of voluntary dismissal without prejudice.

Crye filed a new complaint, dated February 17, 2015, in New York state court.  Duro removed the action to this Court on March 6, 2015, and Crye filed its Amended Complaint on June 25 alleging five Counts.  Counts Four and Five, both breach of contract claims, were remanded to state court on June 29.  Three counts of the Amended Complaint remain.  Count One is a breach of contract claim alleging that Duro's production and sales of Scorpion W2 breach § 3(h) of the 2012 License Agreement.[3]  Count Two is a Lanham Act claim for trade dress infringement under 15

---

[3] As relief for Count One, Crye seeks both money damages and injunctive relief.  While Crye's claim for injunctive relief is barred by 28 U.S.C. § 1498(a), Crye's claim for damages remains. Crye Precision LLC v. Duro Textiles, LLC, 112 F. Supp. 3d 69, 71, 75-76 (S.D.N.Y. 2015).

U.S.C. § 1125(a), alleging that Scorpion W2 misappropriated the MUTLICAM trade dress, and Duro's manufacture of Scorpion W2 products is therefore likely to cause confusion as to the origin, sponsorship, or approval of Duro's goods, services, or commercial activities.  Count Three is a common law unfair competition claim alleging that Duro both palmed off and misappropriated the MULTICAM trade dress.

On October 23, 2015, in the midst of fact discovery, Duro moved for summary judgment on these remaining three claims. Among other arguments, Duro claims that § 3(h) is unenforceable and that Crye has failed to establish the likelihood of confusion or bad faith required for its trade dress infringement and unfair competition claims.  On December 1, Crye submitted a request for further discovery from Duro pursuant to Fed. R. Civ. P. 56(d), seeking further evidence that Duro was a proponent of § 3(h), that there is a likelihood of confusion between Scorpion W2 and MULTICAM, and that Duro acted in bad faith.  Duro's motion became fully submitted on December 18.  In the interim, discovery has been stayed.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary

judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Gemmink v. Jay Peak Inc., 807 F.3d 46, 48 (2d Cir. 2015); Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 97 n.6 (2d Cir. 2015).  "Although the nonmoving party is entitled to have inferences drawn in his favor at summary judgment, such inferences must be supported by record evidence."  Id.

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or

conjecture as to the true nature of the facts." Hicks v.
Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).
Only disputes over material facts -- "facts that might affect
the outcome of the suit under the governing law" -- will
properly preclude the entry of summary judgment. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where a party opposing summary judgment "shows by affidavit
or declaration that, for specified reasons, it cannot present
facts essential to justify its opposition, the court may: (1)
defer considering the motion or deny it; [or] (2) allow time to
. . . take discovery." Fed. R. Civ. P 56(d).  That declaration
must detail,

> (1) what facts are sought [to resist the motion]
> and how they are to be obtained, (2) how those
> facts are reasonably expected to create a genuine
> issue of material fact, (3) what effort affiant
> has made to obtain them, and (4) why the affiant
> was unsuccessful in those efforts.

Miller v. Wolpoff & Abramson, LLP, 321 F.3d 292, 303 (2d Cir.
2003) (citation omitted).  A court is free to reject a non-
movant's Rule 56(d) requests "if the evidence sought would be
cumulative or if the request is based only on speculation as to
what potentially could be discovered; and a bare assertion that
the evidence supporting [non-movant]'s allegations is in the
hands of the moving party is insufficient to justify the denial

of summary judgment." In re Dana Corp., 574 F.3d 129, 148-49
(2d Cir. 2009) (citation omitted).

I.   Count One: Breach of Contract

Duro first seeks summary judgment on Crye's claim alleging
breach of § 3(h) of the 2012 Licensing Agreement.  Section 3(h)
provides, in relevant part, that "during or after the term or
expiration of this Agreement," Duro will not "make any products
that are similar to MULTICAM through color palette, pattern or
arrangement or placement of any elements incorporated in
MULTICAM."  Duro argues that this non-compete provision of
§ 3(h) of the 2012 License Agreement is unenforceable under New
York law, and that even if it were enforceable, Duro did not
"make" Scorpion W2 nor is Scorpion W2 "similar to" MULTICAM.
Duro's motion is granted.  Section 3(h) is unenforceable.

Under New York law, the enforceability of a restrictive
covenant depends in part on the nature of the underlying
contract.  Traditionally, the New York Court of Appeals viewed
covenants not to compete "with high disfavor" and denounced them
as "against the benefit of the commonwealth." Purchasing
Associates, Inc. v. Weitz, 13 N.Y.2d 267, 271 (1963) (citation
omitted).  New York courts, however, came to realize that "there
were situations in which it was not only desirable but essential
that such covenants not to compete be enforced."  Id.  One such
situation is a covenant associated with the "sale of a

business," which will be enforced if the covenant is
"'reasonable,' that is, not more extensive, in terms of time and
space, than is reasonably necessary to the buyer for the
protection of his legitimate interest in the enjoyment of the
asset bought."  Id. at 271-72; see also Pantone, Inc. v. Esselte
Letraset, Ltd., 878 F.2d 601, 608 n.2 (2d Cir. 1989); Chevron
U.S.A., Inc. v. Roxen Serv., Inc., 813 F.2d 26, 28-29 (2d Cir.
1987).

New York courts will also enforce non-compete covenants
between employers and employees.  New York courts apply "a much
stricter attitude with respect to covenants of this type,"
Purchasing Asscoiates, Inc., 13 N.Y.2d at 272, "because of the
powerful considerations of public policy which militate against
sanctioning the loss of a person's livelihood."  Brown & Brown,
Inc. v. Johnson, 25 N.Y.3d 364, 370 (2015) (citation omitted).
The enforceability of these covenants thus "depends in the first
place upon whether the covenant is reasonable in time and
geographic area."  Ticor Title Ins. Co. v. Cohen, 173 F.3d 63,
69 (2d Cir. 1999); see also Chevron U.S.A., Inc., 813 F.2d at
28-29.

Non-compete covenants in ordinary commercial contracts,
such as a licensing agreements, are analyzed "under a simple
rule of reason, balancing the competing public policies in favor
of robust competition and freedom to contract."  Mathias v.

Jacobs, 167 F. Supp. 2d 606, 611 (S.D.N.Y. 2001) (citation omitted); cf. Hodge v. Sloan, 107 N.Y. 244, 249-50 (1887) (upholding an agreement not to sell sand as the covenant was "not larger than is necessary").  Courts typically consider three factors to determine the enforceability of non-compete covenants in ordinary commercial contracts: (1) whether the covenant protects a legitimate business interest; (2) the reasonableness of the covenant with respect to geographic scope and temporal duration; and (3) the degree of hardship imposed upon the party against whom the covenant is enforced.  Mathias, 167 F. Supp. 2d at 611.  The application of these factors "depends entirely on the totality of circumstances."  Greenwich Mills Co. v. Barrie House Coffee Co., 459 N.Y.S.2d 454, 456 (2d Dep't 1983).

Crye has a legitimate business interest in protecting its intellectual property rights in MULTICAM and § 3(h) is largely directed towards protecting those rights.  Section 3(h) is entitled "Intellectual Property" and is bookended by prohibitions preventing Duro from reverse engineering MULTICAM or making derivative works.  Crye also claims that § 3(h) serves several other legitimate business interests, including protection against unfair competition, safeguarding its goodwill and brand recognition, protecting Crye's status as a market leader and innovator, and ensuring the continued viability of

14

its licensing program.  The prevention of unfair competition is
a legitimate business interest.  See BDO Seidman v. Hirshberg,
93 N.Y.2d 382, 392 (1999).

Accepting that each of these identified business interests
entitles Crye to a degree of protection, § 3(h) is impermissibly
broad in scope and unduly burdensome.  Section 3(h) does not
simply cover camouflage patterns that infringe on Crye's
intellectual property rights in MULTICAM, but extends as well to
patterns that are "similar" to MULTICAM.  Section 3(h) provides
no criteria to provide notice of what Crye considers to be
similar.  It provides that any product similar to MULTICAM
through "color palette, pattern or arrangement or placement of
any element incorporated in MULTICAM" made by Duro is
prohibited.  This provision is impermissibly vague and
overbroad.  If enforced to its extreme, Crye could prevent Duro
from printing any camouflage pattern.  Moreover, § 3(h) has no
limits on its geographic scope or temporal duration, which
places its burdens on Duro anywhere in perpetuity.  Whether to
protect Crye's licensing program, safeguard the MULTICAM patent,
or otherwise, § 3(h) is far broader than necessary and is
unreasonable.

Crye claims that it has never sought to enforce § 3(h) with
regard to any camouflage pattern other than Scorpion W2.  The
fact that, as of today, Crye has chosen not to enforce § 3(h)

15

for other camouflage patterns does not diminish the breadth of covenant, nor does it ensure that Crye will not seek to enforce § 3(h) more broadly in the future.

Crye also asserts that Duro created its own hardship by rejecting Crye's 2014 Non-Exclusive License Agreement.  But, that proposed agreement also contained a non-compete clause similar to § 3(h) in the 2012 License Agreement.

Crye further maintains that Duro is estopped from challenging the enforceability of § 3(h) because Duro derived benefits from the non-compete provision.  Specifically, Crye alleges that it shared $10 million with Crye in license fees generated from licensees' sales of MUTLICAM, that § 3(h) protected Duro's right to sell MUTLICAM commercially, that § 3(h) ensured that Duro would be on equal footing with other MULTICAM licensees, and that Duro actively pushed for the inclusion of § 3(h).

Estoppel, an equitable remedy, cannot be used to enforce contract provisions that contravene public policy.  See, e.g., Rates Tech. Inc. v. Speakeasy, Inc., 685 F.3d 163, 171-74 (2d Cir. 2012) (patent law).  "This is so regardless of the equities as between the parties for the very meaning of public policy is the interest of other than the parties."  Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 844 (2d Cir. 1952) (securities law) (citation omitted).  Accepting each of Crye's contentions as

16

true, Section 3(h) remains unenforceable because it is an unreasonable restraint on robust competition.[4]

In the alternative, Crye asks the Court to exercise its discretion to "blue pencil" § 3(h), cutting it down to an appropriate scope.  Crye suggests reducing § 3(h)'s scope to six years within the United States.  Where a restrictive covenant contains both reasonable and overbroad provisions, a court may "make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it."  Karpinski v. Ingrasci, 28 N.Y.2d 45, 52 (1971) (citation omitted).

The Court declines Crye's invitation.  The restriction of § 3(h)'s broad prohibition to six years within the domestic market would still be overbroad.  Moreover, this Court is ill-equipped to create objective criteria as to the similarity of camouflage patterns.  Finally, even if Crye had proposed a reasonable limitation on the scope of § 3(h), it would not be appropriate to impose it retroactively nearly two years after the expiration of the 2012 License Agreement.

---

[4] Crye cites two New York cases for the proposition that parties having accepted the benefits of a contract may not seek to avoid its terms.  Royal Court Realty Co. v. Thomas, 19 N.Y.S.2d 257, 260 (1st Dep't 1940); Pavone v. Aetna Casualty & Surety Co., 398 N.Y.S.2d 630, 634 (Sup. Ct. 1977).  These cases are inapposite, as neither invokes estoppel to enforce a contract provision that contravenes public policy.

II.  Count Two: Trade Dress Infringement

Duro next moves for summary judgment of Count Two, Crye's Lanham Act claim for trade dress infringement, unfair competition, and false designation of origin. Under Section 43 of the Lanham Act:

> Any person who, on or in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).  A product's trade dress "encompasses the overall design and appearance that make the product identifiable to consumers."  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 118 (2d Cir. 2001).

To evaluate this claim, courts first "look to see whether plaintiff's mark merits protection."  Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 216 (2d Cir. 2012) (citation omitted); see also Nora Beverages, Inc., 269 F.3d at 118 (trade dress infringement).  In order for a trade dress to be protectable, "the mark must be distinctive and not generic."  Christian Louboutin S.A., 696 F.3d at 216 (citation omitted).  A mark is "inherently distinctive" if "its

intrinsic nature serves to identify a particular source." Id. (citation omitted).  A trade dress can also "acquire" distinctiveness by developing "secondary meaning in the public mind." Id. (citation omitted).  "A mark has acquired secondary meaning when, in the minds of the public, the primary significance of a product feature is to identify the source of the product rather than the product itself." Id. (citation omitted).  Crye only alleges that MULTICAM has acquired a secondary meaning.

Courts next "determine whether [the] defendant's use of a similar mark is likely to cause consumer confusion." Id. at 217 (citation omitted).  "[A] plaintiff must prove . . . a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers" in order to establish a likelihood of confusion.  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009) (citation omitted).  In determining whether there is a likelihood of confusion, courts apply the eight-factor balancing test introduced in Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492 (2d Cir. 1961).  The eight factors are

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may bridge the gap by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was

adopted in bad faith; (7) respective quality of the
products; and (8) sophistication of consumers in the
relevant market.

Kelly-Brown v. Winfrey, 717 F.3d 295, 307 (2d Cir. 2013)

(citation omitted); see also Nora Beverages, Inc., 269 F.3d at

119 (trade dress infringement).

The parties dispute the similarity of Scorpion W2 and

MULTICAM.  But, even assuming that these patterns are similar

and that the first three Polaroid factors weigh in Crye's favor,

there is no likelihood of confusion associated with Duro's sales

of Scorpion W2 to the Government.  The Government is the creator

and only purchaser of Scorpion W2.  It is a sophisticated

consumer, as its creation of Scorpion W2 and its announced

switch from MUTLICAM in 2014 evinces.  Duro's only sales of

Scorpion W2 have been for the Government, specifically to

Government contractors and subcontractors in the supply chain

for the U.S. Army.  These contractors order Scorpion W2 from

Duro by name.  Thus, while MULTICAM and Scorpion W2 compete in

the same Government sales market, there is no likelihood of

actual confusion on the part of the Government or its

contractors.  In fact, the Army materials submitted by Crye

describing the changeover to Scorpion W2 explicitly distinguish

between OCP and OEF-CP uniforms.  Moreover, Crye has not

demonstrated Duro's bad faith: Duro did not create Scorpion W2,

nor did it manifest any intention of misleading the Government

as to Crye's MULTICAM trade dress.  Accordingly, the <u>Polaroid</u> factors weigh against a finding of a likelihood of confusion.

Crye argues that Duro ignores an important class of downstream purchasers: the Army soldiers themselves.  Crye claims that soldiers will be purchasing products printed in Scorpion W2 in Army Clothing and Sales Stores, and that as a result these soldiers and other members of the public may be confused between Scorpion W2 and MULTICAM.  It is true that post-sale confusion may exist where a prospective purchaser sees the infringing product outside the retail store.  <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.</u>, 799 F.2d 867, 872-73 (2d Cir. 1986).[5]  But, the evidence submitted by Crye suggests that soldiers have no discretion over their uniforms, either when deployed or when purchasing a uniform in an Army store.  It is the military that decides what soldiers may

---

[5] Crye cites two cases to support its proposition that the likelihood of confusion test includes the non-purchasing public, <u>U.S. v. Hon</u>, 904 F.2d 803 (2d Cir. 1990), and <u>Landscape Forms, Inc. v. Columbia Cascade Co.</u>, 113 F.3d 373 (2d Cir. 1997). Normally, the Lanham Act's test inquires whether the ordinary prudent purchaser is likely to be misled.  In cases of counterfeiting or tarnishment of reputation, the inquiry may be broader to include the impact on the public more generally.  4 <u>McCarthy on Trademarks and Unfair Competition</u> § 23:7 (4th ed.). "But, such third parties are only relevant if their views are somehow related to the goodwill of the aggrieved manufacturer." <u>Landscape Forms, Inc.</u>, 113 F.3d at 382-83 (citation omitted). Here, there is no likelihood that soldiers would even be aware of Crye's trade dress, particularly given the lack of discretion they have in their uniform choices.

purchase and wear and there is no evidence that the Government personnel making these purchasing decisions are confused by any similarity in design.  Scorpion W2 is not available for commercial sales and does not compete with MULTICAM in that market.

Crye also argues that it has sufficiently established Duro's bad faith by showing its actual or constructive knowledge of Crye's mark.  In analyzing Duro's bad faith, the "only relevant intent is intent to confuse.  There is a considerable difference between an intent to copy and an intent to deceive." Starbucks Corp., 588 F.3d at 117 (citation omitted).  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  Id. at 117-18 (citation omitted). While "deliberate copying may indicate that the defendant acted in bad faith, the District Court is not required to draw that inference where there is evidence to the contrary."  Id. at 118 (citation omitted).  Here, Duro did not create Scorpion W2 using its knowledge of MULTICAM, but merely prints a Government design at the Government's request.  Crye has presented no evidence that Duro sought to benefit from Crye's good will and reputation, or that Duro intended to sow confusion between Scorpion W2 and MULTICAM.

III. <u>Count Three: Unfair Competition Under New York Law</u>

Duro moves for summary judgment on Cyre's claim of unfair competition under New York law.  "We have long recognized two theories of common-law unfair competition: palming off and misappropriation."  <u>ITC Ltd. v. Punchgini, Inc.</u>, 9 N.Y.3d 467, 476 (2007).  "Palming off," which involves "the sale of the goods of one manufacturer as those of another," was "the first theory of unfair competition endorsed by New York courts, and has been extended . . . to situations where the parties are not even in competition.  <u>Id.</u> (citation omitted).  In contrast, "misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."  <u>Id.</u> at 478 (citation omitted).  The term "property" has been used interchangeably with "commercial advantage."  <u>Id.</u>  Under New York law, unfair competition claims "closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent."  <u>Nadel v. Play-By-Play Toys & Novelties, Inc.</u>, 208 F.3d 368, 383 (2d Cir. 2000) (citation omitted).  As discussed above, Crye has failed to show either a violation of the Lanham Act or that Duro acted in bad faith.  Accordingly, Count Three cannot be sustained.

IV.   <u>Crye's Rule 56(d) Requests</u>

Crye has also presented an affidavit seeking further discovery under Fed. R. Civ. P. 56(d).  Specifically, Crye seeks the opportunity to develop evidence that Duro was a proponent of § 3(h), that there is a likelihood of confusion between Scorpion W2 and MULTICAM under the <u>Polaroid</u> factors, and that Duro acted in bad faith.

Crye has failed to satisfy its burden under Rule 56(d). None of the facts which Crye contends it seeks to develop are material to the outcome of this motion, for the reasons already explained above.

<b><u>CONCLUSION</u></b>

Duro's October 23, 2015 motion for summary judgment is granted.  Crye's remaining claims are dismissed with prejudice. The Clerk of Court shall close the case.

SO ORDERED:

Dated:   New York, New York
         April 22, 2016

_____
DENISE COTE
United States District Judge